## OCHOA *v.* HERNANDEZ Y MORALES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES
FOR PORTO RICO.

No. 92. Submitted December 17, 1912.—Decided June 16, 1913.

Under § 35 of the Foraker Act, appeals from the District Court of the
United States for Porto Rico are subject to the provisions applicable
to appeals from the Supreme Courts of the Territories under the
act of April 7, 1874, under which the jurisdiction of this court is con-
fined, in a case where there are no errors assigned upon questions of
evidence, to determining whether the findings of the court below
support the judgment. *Rosaly* v. *Graham,* 227 U. S. 584.

Even if the commanding officer in territory occupied by military forces
of the United States has all the legislative power as to such territory
possessed by Congress, he is still subject, as Congress is, to the pro-
visions of the Fifth Amendment and cannot by military orders de-
prive persons of their property without due process of law.

To shorten the period for acquisition of title by prescription and give
the order a retroactive effect so that the period has elapsed at the
time the order is made without giving those who have interests in
the property an opportunity to be heard and saving no existing rights,
amounts to taking property without due process of law.

The provision in the judicial order of General Henry published April 7,
1899, during the military occupation of Porto Rico by the United
States, reducing the period for prescriptive title to real estate in that
island from the periods previously established by law down to six
years with retroactive effect and without any opportunity for third
parties to be heard, amounted to a deprivation of property of the
actual owners without due process of law and was beyond the power
of the Military Governor; nor was this provision ratified by any sub-
sequent action of Congress.

The status of Porto Rico during the military occupancy and before the
exchange of ratifications of the treaty of peace, was the same as that
of the Philippine Islands during the same period.

From the exchange of ratifications until Congress acted by the passage
of the Foraker Act the provisional government established in Porto
Rico continued as before the peace.

During the entire period General Orders No. 101 relating to Cuba and

reiterated *mutatis mutandi* as to Porto Rico by General Miles continued in force as the recognized declaration of principles by which the Military Government was limited, and under this the Governor was without authority to make any order that would deprive any person of his property without due process of law.

While the exact definition of the term "due process of law" may be uncertain, it is certain that it inhibits the taking of one man's property and giving it to another, contrary to settled usages and modes of procedure, and without notice or an opportunity to be heard.

Statutes of limitation may be modified by shortening the time which is still running but only so that a reasonable time still remains for commencement of an action before the bar takes effect.

Wherever registry laws are in force, the rule is that a purchaser takes subject to any defects and infirmities that may be ascertained by reference to the chain of title as spread on the record, and this includes invalidity of an order on which title is based.

Under the registry law of Porto Rico rights of third parties were preserved and a mortgagee or grantee acquired no better right before the expiration of the period of prescription than the grantor, but took subject to the rights of infants who owned property the title to which had been fraudulently registered in the name of the grantor.

Where the limitations on a person exercising authority are notorious and are simply in accord with national and international law, there is no hardship in applying the rule that rights cannot be acquired under orders made by such person which are wholly beyond his authority.

5 Porto Rico Fed. Rep. 463, affirmed.

THE facts, which involve the title to real estate in Porto Rico and the constitutionality of certain military orders during the military occupation of that Island, are stated in the opinion.

*Mr. T. D. Mott, Jr.*, for appellants:

The Judicial Order of April 4, 1899, is not unconstitutional nor is it repugnant to Art. V of, or the Fourteenth Amendment to, the Constitution of the United States.

Paragraph 3 of the Judicial Order is not a statute of limitations properly so called. It cut off no right of action on the part of anyone. In the present case it permitted appellants' grantor to convert his possessory into a *dominio*

title to the land in dispute and record the same.   In no way did it affect the rights of appellees.

The conversion, though the result of judicial proceedings, did not have the effect of *res judicata*, and did not bind anyone who did not appear in said proceedings.  *Calderon* v. *Garcia*, 14 P. R. Sup. Ct. 407; *Gonzalez* v. *El Pueblo*, 10 P. R. Sup. Ct. 458.

Even as to those who had so appeared and opposed the conversion sought by such proceedings, their rights could not be adjudged, or passed upon, in those proceedings, but such rights must be decided in an ordinary action of revindication.  The court is limited in such proceedings of conversion to saying whether or not the petitioner has shown a right to the conversion asked for.   It cannot pass upon the rights of others.  *Diaz* v. *Waymouth*, 13 P. R. Sup. Ct. 317; *Paris* v. *Porto Rico*, 5 P. R. Sup. Ct. 29.

The alleged rights of appellees concerning the land in question were not affected by the conversion proceedings whereby appellants' grantor converted his possessory title into a title of ownership, or dominion title.   Nor did the recording of the *dominio* title by such grantor cut off any of the alleged rights of these appellees.   If such title was fraudulent, it was liable to attack, even after registry, within any period short of thirty years, after he had entered into possession of the land and while still recorded in his name, or in that of any other person, excepting an innocent purchaser without notice, or in the language of the civil law "a third party with good faith."  *Abella* v. *Antunano*, 14 P. R. Sup. Ct. 485; *Paris* v. *Porto Rico*, 5 P. R. Sup. Ct. 29; *Valdes* v. *Valle*, 1 P. R. Sup. Ct. 75 (Span. ed.); *Gonzalez* v. *El Pueblo*, 10 P. R. Sup. Ct. 458.

As appellees could have exercised their right of action against appellants' grantor after the latter had converted his possessory title into a title of dominion and had recorded such title, and the exercise by appellees of such right of action was as ample and full after the recording

of such dominion title as it was before such record, paragraph 3 did not cut off any supposed right of appellees, and therefore does not violate the provisions of Art. V of, or the Fourteenth Amendment to, the Constitution of the United States.

Paragraph 3 of the aforesaid Judicial Order, which provides for the conversion of entries of possession into records of ownership, is in no sense a statute of limitation. But, even if it be so considered, it took away no remedy which these appellees possessed before its passage. A statute of limitation which takes away no remedy which the landowner had before its passage is not unconstitutional and is valid. *Turner v. New York*, 168 U. S. 90; *Saranac Land Co. v. New York*, 177 U. S. 318.

The Judicial Order of April 4, 1899, has been enforced in many cases by the Supreme Court of Porto Rico, although in such cases its validity or constitutionality was not questioned or involved. *Ex parte Pinto*, 6 P. R. Sup. Ct. 149; *Ex parte Martinez*, 6 P. R. Sup. Ct. 169; *Ex parte Miner*, 6 P. R. Sup. Ct. 261; *Ex parte Sanfeliz*, 6 P. R. Sup. Ct. 501; *Ex parte Tarpia*, 6 P. R. Sup. Ct. 509; *Ex parte Colzada*, 6 P. R. Sup. Ct. 531.

The provisions of Art. V of, and the Fourteenth Amendment to, the Constitution of the United States do not obtain in Porto Rico.

No decision of this court directly determines this point, nor is there any act of Congress which has made the Constitution, or any part of the same, extensive to Porto Rico.

The Judicial Order of April 4, 1899, was a military order, promulgated during the occupancy of Porto Rico by the military forces of the United States, so that said order was previous to the act of Congress of April 12, 1900, which act extended civil government to Porto Rico, and ratified and confirmed all existing laws, military orders, etc., which at that time were in effect in Porto Rico, with some excep-

tions, which are not pertinent to the consideration of the present case. See § 8, act of April 12, 1900.

The trial court erred in holding as matter of law that the deed to appellants whereby their grantor sold to them the lands described in the bill of complaint, is null and void, and that neither such deed nor the recording of the same in the proper registry of property conferred title upon defendants or protected such title in them.

*Mr. Hector H. Scoville* and *Mr. Joseph Anderson, Jr.,* for appellees.

MR. JUSTICE PITNEY delivered the opinion of the court.

This was a suit in equity to establish the right of the complainants (appellees) to a parcel of land containing 106 acres, situate in the Barrio Nuevo, in the Jurisdiction of Naranjito, in the Island of Porto Rico, found to exceed in value the sum of $5,000. The District Court decreed that the complainants were the legal owners of this land by inheritance, and entitled to the possession of it as against the appellants, a firm doing business under the name of J. Ochoa y Hermano; that the firm should deliver possession to the appellees; that all entries in the registry of property, of "dominio" and "posesorio" title by or in favor of that firm, and all other entries of either kind of title as against the appellees, should be canceled, etc. 5 P. R. Fed. Rep. 463. Defendants appealed to this court.

At the time the appeal was taken, § 35 of the act of April 12, 1900, known as the Foraker Act (31 Stat. 77, 85, c. 191), was in force—since superseded by § 244 of the Judicial Code of March 3, 1911, 26 Stat. 1087, 1157, c. 231,—and subjected appeals from the District Court of the United States for Porto Rico to the regulations applicable to appeals from the Supreme Courts of the Territories. These were controlled by act of April 7, 1874, c. 80, § 2,

18 Stat. 27, 28, by which it was provided that instead of the evidence at large, a statement of the facts in the nature of a special verdict, with the rulings of the court on the admission or rejection of evidence when excepted to, should be made and certified by the court below, and transmitted to this court with the transcript of the proceedings and judgment or decree. Our jurisdiction therefore is confined to determining whether the facts found by the District Court support its judgment; for no errors are assigned upon questions of evidence. *Rosaly v. Graham,* 227 U. S. 584, 590, and cases cited.

The findings are in substance as follows:

Jose Maria Hernandez, the paternal grandfather of complainants, was at the time of his death in the year 1872, the owner and in possession of a tract of land in which was included the parcel of 106 acres in controversy. His title to this parcel was never recorded. Upon his death his son, Juan Hernandez, became by inheritance the owner of it, and entered into and remained in possession as owner until his death, which occurred in the year 1887; but his title was never recorded. Upon his death, Juan Hernandez left surviving him two young children, the complainants, and also a widow, their mother; she died in the year 1906, and the complainants, then still minors, became sole owners of the tract by inheritance from their father; but their title has never been recorded.

In the year 1890, the title to the land in question did not appear of record in favor of any person, either in the books of the present or modern registry, or in the books of the old registry, the ancient "anotadurias" or "contadurias." In that year Raimundo Morales, the maternal grandfather of the complainants, fraudulently representing himself to be the owner, appeared before the municipal court of Naranjito, an Insular court, and by certain *ex parte* proceedings obtained from that court a decree declaring him to be entitled to the possession of the land,

but without prejudice to third parties who might show a better right to such possession. The possessory title so obtained was duly recorded or inscribed in the proper registry of property, in the same year, and was the only title to the land that then appeared recorded or inscribed in the registry.

In the year 1899, Morales again appeared before the same Insular court and petitioned for a decree converting the possessory title, or entry of possession in the registry, into a record of ownership (*titulo de dominio*). His petition and the proceedings had thereon in the Insular court were based upon the provisions of a Judicial Order, dated April 4, 1899, and promulgated in the Official Gazette of Porto Rico under date April 7, 1899. This order was made under authority of Major-General Guy V. Henry, U. S. Volunteers, at that time Military Governor of Porto Rico, and by its terms reduced from twenty years to six years the period during which real estate must be held in order to permit the conversion in the registry of a *posesorio* title to a *dominio* title. Upon the application of Morales, such proceedings were had in the Insular court as were provided for in the Judicial Order, and the court in due time made and entered its decree to the effect that the entry of possession, or possessory title which appeared in the registry recorded in favor of Morales, be converted into a record of ownership or *dominio* title. Thereafter, and in the same year (1899), this decree was duly recorded or inscribed by Morales in the proper registry of title, and the *dominio* title thereafter appeared in the registry recorded solely in his name.

In the year 1901, there appearing in the registry no claim or right or title in the land on the part of any other person or persons, Morales, still fraudulently representing himself to be the true owner, mortgaged the land for value to the defendants, constituting the firm of J. Ochoa y Hermano, who truly and in good faith believed him (Mo-

rales) to be the owner of it, and were entirely ignorant of the rights of the complainants therein. The mortgage was duly recorded in the proper registry of property in the same year.

Thereafter, and in the year 1903, the record still showing nothing respecting the ownership of the lands besides the *dominio* title of Morales and the mortgage of the defendants, and they being still ignorant of the rights of the complainants, Morales by deed duly executed before a notary public, in which his wife joined, sold and transferred the land to defendants in full payment of the amounts due and secured by the mortgage. The defendants duly recorded the deed in the same year, and by their agent immediately took possession of the land.

The present action was commenced in 1908, shortly after the complainants arrived at full age.

Upon these facts the District Court concluded as matter of law that the Judicial Order of General Henry, dated April 4, 1899—so far as it operated retrospectively upon the rights of the complainants, who were minors at the time and for some time thereafter, and who owned the land during the entire period of nine years that elapsed between the fraudulent entry of possessory title in the name of their maternal grandfather, Morales, and the promulgation of General Henry's order—was null and void because in contravention of the "due process of law" clause of the Fifth Amendment to the Constitution of the United States.

For an understanding of the questions presented, it should be premised that Congress declared war to exist between this country and Spain by act of April 25, 1898, 30 Stat. 364, ch. 189; that Porto Rico, then a colony of Spain, was occupied by the military forces of the United States from and after July 25; that a protocol was signed in Washington, August 12 (30 Stat. 1742), under which hostilities between the two countries were

suspended pending negotiation of a treaty for the establishment of peace, by the terms of which protocol (*inter alia*) Spain agreed to cede the Island of Porto Rico to the United States and to immediately evacuate it, and commissioners were appointed to meet at Paris and proceed to the negotiation and conclusion of the treaty; that accordingly a treaty was signed at Paris under date December 10, 1898, ratifications being exchanged at Washington, April 11, 1899 (30 Stat. 1754), and by its terms, Porto Rico was ceded to the United States, and (Article IX, p. 1759) "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." The military occupation of Porto Rico was immediately followed by the establishment of a provisional government, as will be mentioned below, and this government continued in control of the affairs of the Island continuously until the ratification of the Treaty, and thereafter until the enactment of the Foraker Act of April 12, 1900, entitled "An act temporarily to provide revenues and a civil government for Porto Rico, and for other purposes" (31 Stat. 77, c. 191).

The statement of facts is silent upon the question of the possession of the property from the death of the father of the appellees in the year 1887 until the appellants entered into possession under the deed given to them by Morales in the year 1903. Assuming (in favor of appellants) that Morales had possession from the time he procured the entry of a possessory title in his name, the effect of this, as between him and the true owners, was that uninterrupted possession for 30 years would ripen into a good title and confer immunity from action (former Civil Code P. R., Articles 1959, 1963, New Civil Code, P. R., §§ 1860, 1864). He was not entitled to avail himself of Article 1957, that declared a prescription by possession for ten years as to persons present, and for twenty

years with regard to those absent, because this was con-
fined to possession "with good faith and proper title;"
and Morales had neither, within the meaning of those
terms as employed in the Code (Former Civil Code P. R.,
Arts. 1940, 1941, 1950, 1952, 1953, 1954; present Civil
Code, §§ 1841, 1842, 1851, 1853, 1854, 1855). The entry
of a possessory title in his name was in effect a judicial
certificate declaring him to be entitled to the possession,
but without prejudice to third parties, who might show
a better right to it. It gave him no title as against them,
but conferred a *prima facie* legitimacy upon his possession,
being "provisional and presumptive evidence of owner-
ship;" and it fixed a date from which his possession should
be treated as originating; and so the entry amounted
(for present purposes) to no more than public notice
that from that time his possession was adverse to the
true owners. *Soto* v. *Registrar of Property*, 15 P. R. Sup.
Ct. 597, 600; *Morales* v. *Landrau*, 15 P. R. Sup. Ct. 761,
772; *Pares* v. *J. Reynes & Co.*, 2 P. R. Fed. 402, 428.

But appellants rest their case upon the provisions of the
Mortgage Law, as amended by the judicial order of Gen-
eral Henry. The Mortgage Law is a somewhat elaborate
system of registration for instruments of conveyance
that, having been long in force in the Peninsula, was
extended to Porto Rico and the Philippines in or about
the year 1893. It was designed to give to purchasers
and mortgagees, acquiring interests in lands in reliance
upon recorded titles, protection against claims and in-
terests of which no notice was conveyed by the records.
Its provisions are to be read in connection with those of
the Civil Code. By Art. 27, "Those who have not par-
ticipated in the recorded instrument or contract" are
considered as third persons. By Art. 33, "The record of
instruments or contracts which are null in accordance
with the law are not validated thereby." But, notwith-
standing this, by Art. 34, "Instruments or contracts

executed or covenanted by a person who, according to the Registry, has a right thereto, shall not be invalidated with regard to third persons, after they have once been recorded, although later the right of the person executing them is annulled or determined by virtue of a prior deed not recorded, or for reasons which do not clearly appear from the Registry. Only by virtue of a recorded instrument may another later instrument, also recorded, be invalidated to the prejudice of third persons, [with exceptions not now material.] The provisions of this Article [34] may at no time be applied to the instrument recorded in accordance with the provisions of Article 390, unless the prescription has validated or secured the interest referred to therein." By Art. 36, "Suits for rescission or determination of title shall not be instituted against third persons who have recorded the instruments of their respective interests in conformity with the provisions of this law." But by Art. 37 exceptions are made to the rule thus declared, and one of them is—"Suits for rescission or determination of title which are due to the causes plainly expressed in the Registry."

Subsequent sections provide for the mortgaging of different interests in real property, and for various purposes, and declare the effect that shall be given to the mortgages, provide for the manner of keeping the registries, for making and correcting entries therein, and for proceedings for clearing the title of unrecorded mortgages and other charges and interests. Art. 389 prohibits the admission in the courts, etc., of unrecorded documents or instruments if presented for the purpose of enforcing, to the prejudice of third persons, interests which should have been recorded. Articles 390 to 395 inclusive contain provisions under which owners who lack a recorded title of ownership are permitted to record their interests by previously proving their possession before the Judge of First Instance, or the proper Municipal Judge, with

the consent of the Department of Public Prosecution and citation of the adjacent property owners, should they desire to record the absolute ownership of some estate, and with the citation of the owner or other participants in the ownership, should they desire to record some property right. Article 391 prescribes the form of the proceedings. Article 392 provides that the court, on approving the proceedings, shall "order that the record requested be made in the Registry without prejudice to a third person having a better claim." Among the prerequisites for converting entries of possession into records of ownership under this procedure it was, by par. 6 of Art. 393, provided that twenty years must have elapsed since the date of entry of possession. By Art. 394—"If the twenty years calculated from the date of the entry [of possession] have not elapsed, or the requisites mentioned in Article 393 of this law have not been complied with, the entries of possession shall have the legal effect embraced in the provisions contained in the following paragraphs, [viz]. The period of possession which appears to have elapsed at the time said entries are made shall be computed for the prescription which does not require a just title, unless a person prejudiced thereby denies it, in which case said period of possession must be proved in accordance with the common law. Entries of possession shall prejudice or favor third persons from the date of their record, but only with regard to the effects which the laws attribute to mere possession. The entry of possession shall not prejudice the person who has a better right to the ownership of the realty, although his title has not been recorded, unless the prescription has confirmed and secured the claim recorded. Between the parties the possession shall be effectual from the date prescribed by the common law. The provisions contained in the preceding Articles, regarding the entries of possession, can not be applied to mortgage rights, which can

not be recorded unless an instrument in writing is presented."

Under the Mortgage Law, it seems to be settled that there proceedings for proving possession or ownership before the courts of first instance or municipal courts, although judicial in form, are intended merely as aids to the establishment of a system of authenticated instruments of title for purposes of the public records; that although under some circumstances it is required that notice be given to the owner or other persons interested adversely to the applicant, the proceedings are really *ex parte*, have not the effect of *res judicata*, and do not bind any one who does not appear. *Gonzalez* v. *The People*, 10 P. R. Sup. Ct. 458; *Calderon* v. *Garcia*, 14 P. R. Sup. Ct. 407, 416. And even with respect to a party who appears and opposes the entry of a possessory title or its conversion into a *dominio* title, his rights can not be adjudged or passed upon in these proceedings, but must be decided in an ordinary action of revindication; the court being limited, in the proceedings under the Mortgage Law for a conversion of a possessory to a *dominio* title, to saying whether petitioner has shown a right to the conversion asked for; but without passing upon the rights of others. *Paris* v. *The People*, 5 P. R. Sup. Ct. 29; *Diaz* v. *Waymouth*, 13 P. R. Sup. Ct. 317.

This is conceded by the appellants, who, indeed, base their argument upon it; contending, further, that, because of what has just been said, the rights of appellees in the land in question were not affected by the proceedings whereby Morales converted his possessory title into a title of ownership, and that the recording of this *dominio* title by him did not cut off any of their rights; that if such title was fraudulent it was liable to attack, even after registry, within any period short of thirty years after he had entered into possession of the land and while still recorded in his name, or in that of any other person

excepting an innocent purchaser without notice; or, in the language of the civil law, "a third party with good faith." *Paris* v. *The People*, 5 P. R. Sup. Ct. 29, 37; *Gonzalez* v. *The People*, 10 P. R. Sup. Ct. 458, 462; *Abella* v. *Antunano*, 14 P. R. Sup. Ct. 485, 494; *Merchant* v. *Lafuente*, 5 Phil. Rep. 638, 644.

Upon the strength of this, it is ingeniously argued that under the law of Porto Rico it was not the conversion of the apparent title of Morales from a possessory to a *dominio* title that cut off the rights of the appellees; but it was the fact that the appellants, in reliance upon that apparent title, and (as is said) without notice of the rights of the appellees, purchased the land from Morales, which by virtue of the Mortgage Law gave to them a better right than the appellees. And from this it is contended that the Judicial Order, in reducing from twenty years to six years the time that must elapse between the entry of a possessory title and its conversion into a *dominio* title, did not cut off any right of appellees, and therefore was not and is not inconsistent with "due process of law."

But it seems to us that there can be no difference in principle—so far as concerns the question whether the property of the appellees was taken from them without due process—whether there were two steps or three steps in the course of procedure by which the end was accomplished. Whether the retroactive effect of the Judicial Order resulted in conferring upon Morales a title that he himself could maintain against the true owners, or whether it conferred upon him an apparent title that not he himself but his grantees could maintain, makes no difference in a controversy between his grantees and the true owners.

In short, the position of appellees is that by the fraudulent conduct of Morales, *plus* the Mortgage Law, *plus* the Judicial Order, *plus* the *dominio* title in Morales founded thereon, and the recording thereof, *plus* the

mortgage and deed to appellants, their property has been taken from them and given to appellants, without notice to them or an opportunity for a hearing; and that the proceedings in court for converting the possessory into a dominion title, while bearing the semblance of judicial proceedings, departed therefrom in the essentials. To this, it is no answer to say that those proceedings in court did not, under the Mortgage Law, purport to be judicial proceedings at all; nor to say that they would have done no harm except for the subsequent conveyance by Morales to the appellants.

We proceed, therefore, to consider the fundamental question upon which the court below rested its decree.

The Judicial Order of General Henry, dated April 4, and published April 7, 1899 (Mil. Ord. Porto Rico, vol. 2, p. 71), contains seven clauses or paragraphs, of which the first amends Art. 1957 of the Civil Code so as to reduce the period for prescription by possession accompanied with good faith and a proper title, from ten years with respect to persons present, and twenty years with respect to persons absent, down to six years as to persons both present and absent. This has no direct bearing upon the present case, for reasons already indicated.

Other clauses of the Order amend Articles 391, 393, 394, and 395 of the Mortgage Law. The most important is that which amends paragraph 6 of Article 393, so as to reduce from twenty years to six years the period during which possession must continue in order to convert an entry of possession into a record of ownership upon the public records. The final clause declares: "This order shall have retroactive effect."

The court below held (5 P. R. Fed. Rep. 463) that assuming General Henry possessed all the legislative power that is possessed by Congress under the Constitution, he was still necessarily subject (as Congress would be) to the

"due process of law" clause of the Fifth Amendment. And since his judicial order, because of its retroactive clause, by its terms covered the present case, where the real owners of the land were infants and unable to protect themselves, and where they still had, under the Mortgage Law as it stood, nearly twelve years in which to attain maturity and contest the possession and right of Morales,—and since the order shortened the period of limitation to six years, which period in their case had already elapsed, the order at the same time containing no provision for saving existing rights or giving to them or to others in like situation any opportunity to assert their rights; it was the same in effect as taking their property without due process of law:

We find it unnecessary to consider whether the authority of General Henry was subject to the same constitutional limitations as that of Congress; for we have reached a like result, so far as the present case is concerned, upon different reasoning.

Porto Rico at the time was still foreign territory, and was under a provisional military government established by President McKinley as Commander-in-Chief. In order to determine the extent of the authority of General Henry, and the limitations upon it, we must look to the orders under which the military government was established and maintained.

The Island was occupied by the forces of the United States under Major General Miles, Commanding U. S. Army, on July 25, 1898. He appears to have had no special instructions from the President respecting the government that should be established, but it was well understood that he and those under him were subject to the instructions communicated by President McKinley to the Secretary of War under date July 13 with reference to Cuba (10 Mess. & Pap. 214), and published by the War Department as General Orders No. 101,

under date July 18, of which a copy is set forth in the margin.[1]

---

, [1] [Corrected copy.—Please destroy all others.]

GENERAL ORDERS,   }          WAR DEPARTMENT,
                                ADJUTANT GENERAL'S OFFICE,
No. 101.          }          *Washington, July* 18, 1898.

The following, received from the President of the United States, is published for the information and guidance of all concerned:

EXECUTIVE MANSION,
*Washington, July* 13, 1898.

To the SECRETARY OF WAR.

SIR: The capitulation of the Spanish forces in Santiago de Cuba and in the eastern part of the Province of Santiago, and the occupation of the territory by the forces of the United States, render it necessary *to instruct the military commander of the United States as to the conduct which he is to observe during the military occupation.*

*The first effect of the military occupation of the enemy's territory is the severance of the former political relations of the inhabitants and the establishment of a new political power. Under this changed condition of things the inhabitants, so long as they perform their duties, are entitled to security in their persons and property and in all their private rights and relations.* It is my desire that the inhabitants of Cuba should be acquainted with the purpose of the United States to discharge to the fullest extent its obligations in this regard. It will therefore be the duty of the commander of the army of occupation to announce and proclaim in the most public manner that we come not to make war upon the inhabitants of Cuba, nor upon any party or faction among them, but to protect them in their homes, in their employments, and in their personal and religious rights. All persons who, either by active aid or by honest submission, coöperate with the United States in its efforts to give effect to this beneficent purpose will receive the reward of its support and protection. Our occupation should be as free from severity as possible.

*Though the powers of the military occupant are absolute and supreme and immediately operate upon the political condition of the inhabitants, the municipal laws of the conquered territory, such as affect private rights of person and property and provide for the punishment of crime, are considered as continuing in force, so far as they are compatible with the new order of things, until they are suspended or superseded by the occupying belligerent and in practice they are not usually abrogated, but are allowed*

The clauses especially pertinent to the present question are the following: "The first effect of the military occupation of the enemy's territory is the severance of the former political relations of the inhabitants and the establishment

to remain in force and to be administered by the ordinary tribunals, substantially as they were before the occupation. This enlightened practice is, so far as possible, to be adhered to on the present occasion. The judges and the other officials connected with the administration of justice may, if they accept the supremacy of the United States, continue to administer the ordinary law of the land, as between man and man, under the supervision of the American Commander-in-Chief. The native constabulary will, so far as may be practicable, be preserved. The freedom of the people to pursue their accustomed occupations will be abridged only when it may be necessary to do so.

While the rule of conduct of the American Commander-in-Chief will be such as has just been defined, it will be his duty to adopt measures of a different kind, if, unfortunately, the course of the people should render such measures indispensable to the maintenance of law and order. He will then possess the power to replace or expel the native officials in part or altogether, to substitute new courts of his own constitution for those that now exist, or to create such new or supplementary tribunals as may be necessary. In the exercise of these high powers the commander must be guided by his judgment and his experience and a high sense of justice.

One of the most important and most practical problems with which it will be necessary to deal is that of the treatment of property and the collection and administration of the revenues. It is conceded that all public funds and securities belonging to the government of the country in its own right, and all arms and supplies and other movable property of such government, may be seized by the military occupant and converted to his own use. The real property of the state he may hold and administer, at the same time enjoying the revenues thereof, but he is not to destroy it save in the case of military necessity. All public means of transportation, such as telegraph lines, cables, railways and boats belonging to the state may be appropriated to his use, but unless in case of military necessity they are not to be destroyed. All churches and buildings devoted to religious worship and to the arts and sciences, all schoolhouses, are, so far as possible, to be protected, and all destruction or intentional defacement of such places, of historical monuments or archives, or of works of science or art, is prohibited, save when required by urgent military necessity.

of a new political power. Under this changed condition of things the inhabitants, so long as they perform their duties, are entitled to security in their persons and property and in all their private rights and relations. . . . Though the powers of the military occupant are absolute and supreme, and immediately operate upon the political condition of the inhabitants, the municipal laws of the conquered territory, such as affect private rights of person and property and provide for the punishment of crime, are

---

*Private property, whether belonging to individuals or corporations, is to be respected, and can be confiscated only for cause.* Means of transportation, such as telegraph lines and cables, railways and boats, may, although they belong to private individuals or corporations, be seized by the military occupant, but unless destroyed under military necessity are not to be retained.

While it is held to be the right of the conqueror to levy contributions upon the enemy in their seaports, towns, or provinces which may be in his military possession by conquest and to apply the proceeds to defray the expenses of the war, this right is to be exercised within such limitations that it may not savor of confiscation. As the result of military occupation the taxes and duties payable by the inhabitants to the former government become payable to the military occupant, unless he sees fit to substitute for them other rates or modes of contribution to the expense of the government. The moneys so collected are to be used for the purpose of paying the expenses of government under the military occupation, such as the salaries of the judges and the police, and for the payment of the expenses of the Army.

*Private property taken for the use of the Army is to be paid for when possible in cash at a fair valuation, and when payment in cash is not possible, receipts are to be given.*

All ports and places in Cuba which may be in the actual possession of our land and naval forces will be opened to the commerce of all neutral nations, as well as our own, in articles not contraband of war upon payment of the prescribed rates of duty which may be in force at the time of the importation.

                                        WILLIAM McKINLEY.
          BY ORDER OF THE SECRETARY OF WAR:
                                        H. C. CORBIN,
                                            *Adjutant General.*

considered as continuing in force, so far as they are compatible with the new order of things, until they are suspended or superseded by the occupying belligerent, and in practice they are not usually abrogated, but are allowed to remain in force and to be administered by the ordinary tribunals, substantially as they were before the occupation. This enlightened practice is, so far as possible, to be adhered to on the present occasion. . . . Private property, whether belonging to individuals or corporations, is to be respected, and can be confiscated only for cause."

General Miles was second in command only to the President, and as his representative had full control in Porto Rico. That he fully sympathized with the purposes of the President, and intended that all subordinate officers should govern themselves accordingly, appears from his declaration to the inhabitants under date July 28, in which he said: "The first effect of this occupation will be the immediate release from your former political relations, and it is hoped a cheerful acceptance of the government of the United States. The chief object of the American military forces will be to overthrow the armed authority of Spain, and to give to the people of your beautiful island the largest measure of liberty consistent with this military occupation. We have not come to make war upon the people, . . . but, on the contrary, to bring you protection, not only to yourselves but to your property, to promote your prosperity, and to bestow upon you the immunities and blessings of the liberal institutions of our government. It is not our purpose to interfere with any existing laws and customs that are wholesome and beneficial to your people so long as they conform to the rules of military administration, of order and justice. This is not a war of devastation, but one to give to all within the control of its military and naval forces the advantages and blessings of enlightened civilization."

And under date July 29, a letter of instructions was published under the authority of General Miles for the information and guidance of all concerned, in which the substance of General Orders No. 101, *mutatis mutandis*, was embodied, so as to be binding upon the military government of Porto Rico (Rep. War Dept. 1900, Vol. 1, Part 13, pp. 18–22).

The protocol of August 12, 1898 (30 Stat. 1742), the purport of which has already been given, left our Government, by its military forces, in the occupation and control of Porto Rico as a colony of Spain, and bound by the principles of international law to do whatever was necessary to secure public safety, social order, and the guaranties of private property. From this time until the interchange of the ratifications of the treaty on April 11, 1899 (30 Stat. 1754), General Orders No. 101, and the instructions of General Miles to his subordinates dated July 29, 1898, continued to form the authority, and the sole authority, for the military government of Porto Rico.

This island, and the islands and keys adjacent and belonging to it, were by order of October 1, 1898 (General Orders No. 158), established as a military department, and Major General John R. Brooke was assigned to its command. He assumed the command on October 18, and held it until December 8. General Henry succeeded him on that date, and remained in command until after the ratification of the treaty.

The status of Porto Rico during the military occupancy, and before the exchange of ratifications, was the same as that of the Philippines during the same period, and is dependent upon principles expounded in frequent decisions of this court. *Fleming* v. *Page,* 9 How. 603, 614, 615; *Cross* v. *Harrison,* 16 How. 164, 190; *Dooley* v. *United States,* 182 U. S. 222, 230; *MacLeod* v. *United States,* 229 U. S. 416.

From the exchange of ratifications until Congress

acted by the passage of the Foraker Act, the provisional government continued as before the peace. *Santiago* v. *Nogueras,* 214 U. S. 260, 265; *Leitensdorfer* v. *Webb,* 20 How. 176, 178. And see *DeLima.* v. *Bidwell,* 182 U. S. 1, 174, etc.

During the entire period, General Orders No. 101, as reiterated by General Miles, continued in force as the recognized declaration of principles by which the military government was limited. References to official sources of information respecting the period of the military occupancy are given in a marginal note.[1]

Under all the circumstances we deem it clear that the Governor was without authority from the President to make any order, judicial in its nature, that would have the effect of depriving any person of his property without due process of law.

It is said that § 8 of the Foraker Act (31 Stat. 79, c. 191) had the effect of ratifying the Judicial Order of General Henry. That section declared: "That the laws and ordinances of Porto Rico now in force shall continue in full force and effect, except as altered, amended, or modified hereinafter, or as altered or modified by military orders and decrees in force when this act shall take effect, and so far as the same are not inconsistent or in conflict with the statutory laws of the United States not locally inapplicable, or the provisions hereof, until altered, amended, or repealed by the legislative authority hereinafter provided for Porto Rico or by Act of Congress of the United States," with provisos not now pertinent. We can find here no legislative purpose to validate any

---

[1] Reports Major-General Commanding Army, 1898, pp. 31–33; 1899, pp. 321, 325.

Reports War Department, 1899, Vol. 1, Part 6, pp. 488, 491, 565; 1900, Vol. 1, Part 13, pp. 18–30.

General Orders, Department of Porto Rico, 1898, Preface (General Orders No. 101).

order of the Military Governor that was in excess of the authority conferred upon him by the President.

Without the guaranty of "due process" the right of private property cannot be said to exist, in the sense in which it is known to our laws. The principle, known to the common law before Magna Charta, was embodied in that charter (Coke, 2 Inst. 45, 50), and has been recognized since the Revolution as among the safest foundations of our institutions. Whatever else may be uncertain about the definition of the term "due process of law," all authorities agree that it inhibits the taking of one man's property and giving it to another, contrary to settled usages and modes of procedure, and without notice or an opportunity for a hearing.

Now, the effect and operation of the retroactive clause in the Judicial Order of April 4, 1899, as applied to the facts of the concrete case, were such that although Morales had until then no right, title, or interest in the land in question, and had merely established through fraudulent means and without notice to the persons concerned a footing of possession, as a result of which, if they should permit his claims to remain unchallenged, and he should in fact maintain continuous possession for nearly twelve years longer, he would thereby be enabled to procure, by *ex parte* proceedings, an apparent title in himself as against them; yet the Order permitted him at once, and without notice to the owners, to procure such record of ownership in his name, although they were then infants, and, so far as appears, not cognizant of his possession of the land or of any of his proceedings; and then by virtue of other provisions of the Mortgage Law, he could completely deprive them of their property if he could make sale of it to a *bona fide* purchaser without notice of the infirmity of his apparent title.

With reference to statutes of limitations, it is well settled that they may be modified by shortening the time

prescribed, but only if this be done while the time is still running, and so that a reasonable time still remains for the commencement of an action before the bar takes effect. *Terry* v. *Anderson*, 95 U. S. 628, 632; *In re Brown*, 135 U. S. 662, 701, 705; *Wheeler* v. *Jackson*, 137 U. S. 245, 255; *Turner* v. *New York*, 168 U. S. 90, 94; *Wilson* v. *Iseminger*, 185 U. S. 55, 63. Many other cases might be cited. The question of what, under given circumstances, is to be deemed a reasonable time to be allowed for the bringing of an action when a change is made in a statute of limitations has sometimes given rise to discussion. In the present case there is no such embarrassment, for here no time whatever was allowed with respect to the case of these appellees and all others against whose lawful ownership an unlawful possession had been held for more than six years but less than twenty years at the time of the making of the Judicial Order.

Since the proceeding for converting the entry of possession into a *dominio* title, as well as the proceeding for the entry of possession itself, was taken without notice to the owners, the effect of the Judicial Order was precisely the same as if the Military Governor had declared that the property in question should be taken from the lawful owner and given to the fraudulent occupant. Certainly General Henry can have had no such purpose, and must have been wrongly advised with respect to the results that would flow from making the order retroactive. Otherwise he would have confined it to cases where there still remained a reasonable opportunity for the real owner to contest the pretensions of the possessor. And in view of the instructions under which he derived his authority, the Judicial Order must be construed as if expressly thus limited.

But appellants rely upon Articles 33, 34, 36, and 37, already quoted; the effect of which is that the title of "a person who according to the registry has a right thereto

[*e. g.* Morales] shall not be invalidated with regard to third persons [*e. g.* appellants] after they have once been recorded, although later the right of the person executing them [Morales] is annulled or determined . . . for reasons which do not clearly appear from the registry;" and also, that "suits for rescission or determination of title shall not be instituted against third persons [*e. g.* appellants] who have recorded the instruments of their respective interests in conformity with the provisions of this law," except, however, "suits for rescission or determination of title which are due to the causes plainly expressed in. the registry." It is said that since Morales secured the possessory title in 1890, and recorded it in the same year, and secured the conversion of that title into a title of ownership in the year 1899, and recorded this *dominio* title in the same year, and in the year 1901 mortgaged the lands for value to the appellants, and followed this with a conveyance in 1903, he at all times appearing in the registry as sole owner, and since in their transactions with Morales, appellants acted in good faith and in the belief that he was the sole owner, they are protected.

But the findings show that the entry of possession in favor of Morales declared that his right was "without prejudice to third parties who might show a better right to such possession," and that the proceedings for the conversion of the entry of possession into a record of ownership showed upon their face that they were based upon the provisions of the Judicial Order of April 4, 1899.

In other words, when appellants took from Morales the mortgage and deed under which they now claim, they were charged with notice upon the record that his entry of possession was subject to the rights of others; and that by the law as it formerly stood, those rights could not be cut off in less than twenty years. They were also charged with notice that his *dominio* title depended upon

the validity of an order made by the Military Governor purporting to have a retroactive effect and to cut off, without notice or hearing, the claims of the identical third parties whose rights were preserved by the entry of possession; for at the time of the making of the Judicial Order, the six years had already run.

It is a familiar doctrine, universally recognized where laws are in force for the registry or recording of instruments of conveyance, that every purchaser takes his title subject to any defects and infirmities that may be ascertained by reference to his chain of title as spread forth upon the public records. *Brush* v. *Ware*, 15 Pet. 93, 111; *Simmons Creek Coal Co.* v. *Doran*, 142 U. S. 417, 437; *Northwestern Bank* v. *Freeman*, 171 U. S. 620, 629; *Mitchell* v. *D'Olier*, 68 N. J. Law (39 Vr.), 375, 384; 53 Atl. Rep. 467; 59 L. R. A. 949.

This principle is recognized in Articles 34 and 37 of the Mortgage Law. In referring to "reasons which do not clearly appear from the registry," and "causes plainly expressed in the registry," they refer of course to matters of fact, not to matters of law. In other words, if the registry gives notice of a state of facts that renders the title invalid or subject to question in law, the purchaser who relies upon the record takes his title subject to whatever consequences may flow in law from the facts thus notified.

Appellants must be presumed, in accepting the mortgage and the conveyance from Morales, to have done so subject to whatever risk there may have been, arising from the want of authority on the part of General Henry to deprive third parties, without process of law, of those rights that were saved by the terms of the entry of possession in favor of Morales.

Nor is there any real hardship in applying this rule; for the limitations under which the Military Governor exercised his temporary authority in Porto Rico must be deemed to have been notorious everywhere, since they

were proclaimed at the outset by General Miles, repeatedly reiterated during the military *regime,* and indeed were such as arise from general rules of international law and from fundamental principles known wherever the American flag flies.

*Decree affirmed.*