SUCCESSION OF RODRÍGUEZ, PLAINTIFF AND APPELLEE, *v.* SUCCESSION OF TORRES, DEFENDANT AND APPELLANT.

APPEAL from the District Court of Ponce in an Action to Annul Foreclosure Proceedings.

No. 1392.—Decided February 12, 1917.

MORTGAGE—MILITARY ORDERS—INSTRUCTIONS OF PRESIDENT—VESTED RIGHTS—SUSPENSION OF OPERATION OF MORTGAGE LAW.—Applying to this case the

doctrine laid down in *Ochoa* v. *Hernández*, 230 U. S. 139, from the language employed in the instructions of the President of the United States to the Secretary of War (General Orders, War Department, No. 101 of July 13, 1898), it cannot be said to authorize the serious impairment of the vested rights of a mortgagee through the retroactive effect of a military order which attempts to suspend the operation of the Mortgage Law.

ID.—ID.—FORECLOSURE—INTEREST.—It was not the purpose of General Order No. 18 of February 12, 1899, to permit the foreclosure of mortgages on which the interest had been paid, or which bore no interest, under the old Law of Civil Procedure, for that would be to read into it a provision never in the mind of the Military Governor.

ID.—ID.—FORECLOSURE—IMPAIRMENT OF OBLIGATION OF CONTRACT—VESTED RIGHTS—DUE PROCESS OF LAW.—General Order No. 18 of February 12, 1899, was in excess of the legislative authority conferred upon the Military Government under the presidential instructions, and, therefore, null and void as to preexisting mortgages in that, if assumed to be effective, it impaired the obligation of such contracts and deprived the mortgagee of vested rights acquired thereunder.

ID.—LAW GOVERNING MORTGAGE.—The general rule is that the law in force at the time a mortgage is executed, with all the conditions and limitations it imposes, is the law which determines the force and effect of a mortgage; and hence it is that changes in the laws, imposing conditions and restrictions on a mortgagee in the enforcement of his right, and which affect its substance, are invalid as impairing the obligation and cannot prevail.

The facts are stated in the opinion.

*Mr. José Tous Soto* for the appellant.

*Mr. José G. Torres* for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

Plaintiff-appellee brought suit to recover certain lands sold in June, 1901, under the summary procedure prescribed by the Mortgage Law. The complaint alleged the nullity of the sale and is based primarily on the proposition—

"That at the institution of the proceeding for the collection of said mortgage debts and during the entire progress thereof the proceeding for the collection of mortgage debts had been suspended by general orders of the Commander-in-Chief of the Department of Porto Rico, No. 18 of February 12, 1899, No. 10 of January 19, 1900, and No. 92 of April 28, 1900, the District Court of Ponce being without jurisdiction to take cognizance of said mortgage proceedings and to sell at public auction the mortgaged property."

Defendant-appellant denies this and insists that the orders mentioned are "unconstitutional" for want of authority

in the commanding officer thus to deprive mortgagees of their vested rights under the Mortgage Law.

The trial judge rendered judgment for plaintiff, but the "brief statement in the case setting out the facts as found by him and giving the reasons for his decision," required by an act entitled "An Act to amend sections 92, 123, 227 and 299 of the Code of Civil Procedure, approved March 9, 1911," is conspicuous by its absence.

In *Oliver* v. *Oliver*, 23 P. R. R. 168, we expressed serious doubt as to whether the doctrine of *Ochoa* v. *Hernández*, 230 U. S. 139, should control the question now properly raised for the first time in this court. Perhaps the district court was unduly influenced by such *obiter dictum*, but neither the trial judge nor the parties herein have succeeded in developing to any marked degree the thought then suggested; and, indeed, on further reflection we find no satisfactory ground upon which to base any clear distinction as to the fundamental principle involved.

In *Ochoa* v. *Hernández* the Supreme Court, without deciding whether or not the authority of the commanding officer in Porto Rico was subject to the same constitutional limitations as that of Congress, held that, under the instructions communicated by President McKinley to the Secretary of War on July 13, 1898, with reference to Cuba, General Orders, War Department, No. 101, made binding on the Governor of Porto Rico by a letter of instructions of date July 29, published under the authority of General Miles for the information and guidance of all concerned, and thus continued in force as the recognized declaration of principles by which the Military Government was limited, the Military Governor was without authority from the President to make any order, judicial in its nature, that would have the effect of depriving any person of his property without due process of law.

These instructions from the Commander in Chief set forth that the inhabitants of the occupied territory are "entitled

to security in their persons and property and in *all their private rights and relations,*" and express "the purpose of the United States to discharge *to the fullest extent* its obligations in this regard." They proclaim that "the municipal laws of the conquered territory, such as affect *private rights of persons and property* and provide for the punishment of crimes, are considered as continuing in force, so far as they are compatible with the new order of things, until they are suspended or superseded by the occupying belligerent, and in practice they *are not usually abrogated but are allowed to remain in force* and to be administered by the ordinary tribunals substantially as they were before the occupation," and ordain that "*this enlightened practice is, so far as possible, to be adhered to on the present occasion.*"

The sweeping character of these limitations, which, as also pointed out by the Supreme Court, "were such as arise from general rules of international law and from fundamental principles known wherever the American flag flies," is at once apparent.

If the language employed forbids the taking of property without due process of law, through the retroactive operation of a military order reducing the prescriptive period within which a possessory title of record may be converted into a judicial declaration of ownership, thus cutting off at once the right of action of any and all persons already out of possession for more than such shorter period who have not previously asserted their superior rights, it can hardly be said to authorize the serious impairment of the vested rights of a mortgagee through the retroactive effect of a military order which attempts to suspend the operation of the Mortgage Law.

The notion of vested rights is not new to the civil law. "The sweeping maxims of the Roman jurists in condemnation of all retroactive laws were adopted by Bracton in the thirteenth century and have been repeated by Coke and Bacon and applied by the English courts in the only way pos-

sible under an omnipotent parliament; namely, as a rule of construction to the effect that a statute will never be held to divest vested rights if it is capable of any other meaning. From Roman, English and Continental jurists, the same doctrines have become a part of American constitutional law." Due Process of Law, McGehee, p. 153.

The General Orders involved herein read as follows:

"HEADQUARTERS DEPARTMENT OF PORTO RICO,

"SAN JUAN, *February 12, 1899.*

"GENERAL ORDERS,
   "No. 18.

"In view of the facts that it has been represented to the Department Commander by petition and otherwise to his satisfaction, that owing to the crisis caused by the late war and by the scarcity of money of the Island seeking investment, planters owning valuable estates are unable to meet their debts, and that a number of firms in liquidating their business interests in the Island are proceeding to foreclose mortgages on plantations, to the great distress of the owners thereof; and under existing laws these proceedings are of a summary nature, so that actual sales can be effected in thirty days from the time judicial notice is given, thus allowing debtors no sufficient opportunity to raise money.

"It is hereby directed in the interest of equity and to save the agricultural industry from loss and ruin that the said law of foreclosure and all legal or judicial proceedings thereunder with reference to agricultural property and machinery be and they are hereby suspended for the period of one year from this date, namely January 19, 1899, provided that the interest on such debts is paid when due at a rate not exceeding twelve per cent per annum.

"This order is not intended to affect proceedings for the collection of Insular or Municipal taxes.

"That this order may be put into immediate operation it is directed that it be printed in the *Official Gazette* and also promptly communicated to all *alcaldes,* judges, and courts on this Island for their information and compliance.

"By command of Major-General Henry:

"W. P. HALL,
   "*Adjutant-General.*"

"HEADQUARTERS DEPARTMENT OF PORTO RICO,

"SAN JUAN, *January 19, 1900.*

"GENERAL ORDERS,
    "No. 10.

"By direction of the Secretary of War the provisions of General Orders No. 18, series of 1899, from these headquarters, by which the foreclosure of mortgages in Porto Rico was suspended until January 19, 1900, are hereby extended for six months from the date last mentioned, or for such less time as may be hereafter announced by competent authority.

"By command of Brigadier-General Davis:

"W. P. HALL,
    *"Adjutant-General."*

---

"HEADQUARTERS DEPARTMENT OF PORTO RICO,

"SAN JUAN, *April 28, 1900.*

"GENERAL ORDERS,
    "No. 92.

"In compliance with instructions from the Secretary of War. the provisions of General Orders, No. 18, series of 1899, these headquarters, dated February 12, 1899, and General Orders, No. 10, current series, these headquarters, dated January 19, 1900, are re-extended for six months from July 19, 1900; subject to any reduction or other action in regard thereto on the part of the Legislature of Porto Rico when organized.

"By command of Brigadier-General Davis:

"WM. E. ALMY,
    *"Acting Adjutant-General."*

---

"*[Official Gazette, No. 27, Feb. 1, 1899.]*

"HEADQUARTERS DEPARTMENT OF PORTO RICO, SAN JUAN.

"The order of the 19th of January, 1899, concerning the foreclosure of mortgages on agricultural property and machinery, having been misconstrued and interpreted as covering debts it was never intended to cover; I hereby direct that the following instructions be issued to those charged with the administration of the law:

"*First.*—The order aforesaid shall be applied only to debts guar-

anteed by mortgage. In case of such debts, attachments can be suspended without prejudice to the creditor as the mortgage will always constitute a guarantee. Personal debts are different; there would be no guarantee of this class of indebtedness if creditors were prevented from making attachments and were compelled before beginning proceedings for collection to wait a year, during which it would be possible for a debtor to dispose of his property and thus cheat his creditor of his due. This order does not, therefore, refer to personal debts, or debts which are not covered by mortgage.

"*Second.*—Where proceedings in accordance with the terms of the order are taken for the foreclosure of mortgages for non-payment of interest, the execution shall be taken under the old law in force before the present hypothecary law was enacted. The old law gives debtors more than thirty days in which to raise the interest and save their estates.

"*Third.*—When a farm and its products are attached, the property shall not go into possession of the creditor, but shall remain in possession of the owner, who shall be constituted its legal depositary and shall be required to apply the proceeds of the crops for the payment of interest due or the debt itself.

"*Fourth.*—No foreclosure shall be executed under the provisions of this order for unpaid interest when, by reason of a prior attachment, the owner is prevented from selling his crops in order to realize money for the payment of the interest.

"*Fifth.*—In no case shall an estate be sold without revaluation by experts. One expert shall be named by the creditor, another by the debtor, and a third by the judge.

"SAN JUAN, P. R., *January 31, 1899.*

"GUY V. HENRY,
"*Major-General Volunteers,*
"*Commanding.*"

Construing together the first- and last-mentioned of these orders, it is strenuously insisted that they affect only the remedy and do not deprive the mortgagee of any vested right; that the suspension of the summary proceedings of the Mortgage Law removed the only obstacle to ordinary foreclosure under the old Code of Civil Procedure, and that, in order to sustain the validity of General Order No. 18, it should be construed in connection with *Official Gazette* No. 27, *supra,*

as merely modifying without seriously impairing the method of enforcing the mortgage obligation.

That it was not the purpose of General Henry to deprive the mortgagee of any substantial right, may be inferred from his expression of opinion that "in case of such debts attachments can be suspended without prejudice to the creditor, as the mortgage will always constitute a guarantee." That it was his intention to permit the foreclosure in any manner whatever of mortgages on which the interest had been paid, or which bore no interest, is by no means so clear. Personal debts are exempted from the operation of the inhibition because "there would be no guarantee of this class of indebtedness if creditors were prevented from making attachments and *were compelled before beginning proceedings for collection to wait a year,* during which it would be possible for a debtor to dispose of his property and thus cheat his creditor of his due." It is the foreclosure of mortgages for non-payment of interest only that is expressly authorized under the old law, and even as to these it is intimated that, if during the course of the proceedings the mortgage debtor could *"raise the interest,"* the action might be stayed. Moreover, *"no foreclosure shall be executed* under the provisions of this order *for unpaid interest* when by reason of a prior attachment the owner is prevented from selling his crops in order to realize money for the *payment of the interest."* Also, General Order No. 18 is based not so much on the summary character of the Mortgage Law proceeding as on the fact that "planters owning valuable estates are *unable to meet their debts,* and that a number of firms in liquidating their business interests in the Island are proceeding *to foreclose mortgages* on plantations, to the great distress of the owners thereof."

To say, therefore, that General Order No. 18 contemplated the foreclosure of mortgages falling within the scope of its terms under the old Code of Civil Procedure, would be to

read into it a provision which all the circumstances seem to indicate was never in the mind of the Military Governor.

But, however this may be, the conclusive answer to the argument of plaintiff-appellee is found in the peculiar nature and primary purpose of the present Mortgage Law, in *Barnitz v. Beverly*, 163 U. S. 118, which, like the Ochoa case, is binding on this court regardless of our own opinion, and in other cases to the same effect cited in 6 Ruling Case Law at pages 355, 365, sections 352 and 360, in support of the following text:

"It is a fundamental principle of constitutional law in reference to the obligation of contract that the laws in force at the time of making a contract and the right to a remedy enter into and form a part of it as if they were expressly referred to or incorporated in its terms, and that they likewise constitute a part of its obligation. The remedy, which is protected by the contract clause of the Constitution, is something more than the privilege of having a claim adjudicated. Mere judicial inquiry into the rights of parties is not enough. There must be power to enforce the results of such an inquiry before there can be said to be a remedy which the Constitution deems part of the contract. Nothing is more material to the obligation of a contract than the means of its enforcement. The ideas of validity and remedy are therefore inseparable, and both are parts of the obligation which is guaranteed by the Constitution against impairment.

\*        \*        \*        \*        \*        \*        \*

"The general rule is that the law in force at the time a mortgage is executed, with all the conditions and limitations it imposes, is the law which determines the force and effect of a mortgage; and hence it is that changes in the laws, imposing conditions and restrictions on a mortgagee in the enforcement of his right, and which affect its substance, are invalid as impairing the obligation and cannot prevail. Following this rule the law will not permit changes to be made by statute which, as to pre-existing mortgages, extend or otherwise alter the period of redemption, even though a sale has not yet taken place; or direct that decrees be made on a longer period of credit than was allowed at the date of the mortgage; or alter the right of a mortgagee to sale on foreclosure subject only to the redemption provided for by the law in force when the mortgage was

made. Under the same rule a statute which authorizes the redemption of property sold upon foreclosure of a mortgage, where no right of redemption previously existed, cannot constitutionally apply to a sale under a mortgage executed before its passage.''

In submitting the present Mortgage Law to the Spanish Cortes in May, 1893, for legislative sanction, the Colonial Minister, under authority from the King, with the approval of the Council of Ministers and referring to the previous law on the same subject then in force in Porto Rico since May, 1880, said:

''But where the voice of experience has been heard with the greatest clamor against the law, demanding immediate relief, is where it refers to the procedure for making mortgage debts effective. Its crushing confusion, the uncertainty of results, and its incalculable cost restrain capital or suggest usurious conditions; sales and resales take the place of loans, with the object of avoiding all proceedings to the prejudice of the landowner; interest is stipulated which triplicates the capital loaned, and perhaps by the employment of other means the debtor is exposed to penal responsibility, converting the sanctity of laws enacted for the punishment of crimes into a vile instrument of avarice against the unfortunate. Distrust causes these means to be employed because the legal procedure does not satisfy the reasonable requisites of contracts, and to uproot these evils, to furnish land with the capital it needs, and to give the lender assurances of speedy and easy recovery of his loans is the object of the most important reform proposed by the Government, suppressing proceedings which, without positively guaranteeing one's rights, destroy those most sacred. Previous appraisement, uniformity of judicial action in all necessary investigations, suppression of all litigation, only one summons and the immediate sale by auction, are the basis of the new law. We have abolished suits, exemptions, letters requisitorial (exhortos), writs of attachment on the mortgaged property, proceedings in the nature of a demurrer, simultaneous auctions, and a great many other barriers in the path of the credit of reality, which had been placed with the best of intentions, but from which those in good faith were the only victims.''

See also *Jiménez v. Brenes*, 10 P. R. R. 124.

In the circumstances and without reference to the intrinsic merits of the point of view taken by the Spanish Colo-

nial Minister, who at least correctly outlines the true theory of the Mortgage Law as enacted in 1893, we are constrained to hold that General Order No. 18 was in excess of the legislative authority conferred upon the Military Governor under the presidential instructions, and, therefore, null and void as to preexisting mortgages in that, if assumed to be effective, it impaired the obligation of such contracts and deprived the mortgagee herein, and all others similarly situated, of vested personal and property rights, if, indeed, it did not deprive them of their property without due process of law.

The judgment appealed from must be reversed and in lieu thereof it should be adjudged and decreed by this court that the action be dismissed and that plaintiff take nothing by reason of its suit.

*Reversed and substituted.*

Chief Justice Hernández and Justices Wolf, del Toro and Aldrey concurred.