**UNITED STATES of America,**
**Libelant,**

v.

**ISTHMIAN STEAMSHIP COMPANY,**
**Respondent.**

United States District Court
S. D. New York.

May 4, 1961.

S. Hazard Gillespie, U. S. Atty., and Benjamin H. Berman and Walter L. Hopkins, Dept. of Justice, New York City, for libelant.

Kirlin, Campbell & Keating, Clement C. Rinehart, Walter P. Hickey and Norman Pacun, New York City, for respondent.

SOLOMON, District Judge.

In a libel filed by the United States of America (Government) against the Isthmian Steamship Company (Isthmian), a wholly owned subsidiary of the United States Steel Corporation (U. S. Steel), the Government seeks to recover $114,919.21 additional charter hire for the use of a number of Government-owned vessels chartered to Isthmian at various times during the period May 1, 1946, and July 1, 1948.

The bareboat charter party under which these vessels were chartered was dated as of April 29, 1946. It provided for a fixed monthly amount for each vessel, and, in addition, Isthmian agreed to pay additional charter hire according to the formula set forth in Clause 13 of this standard form contract.

> "CLAUSE 13: Additional Charter Hire. After redelivery of all Vessels under this Agreement, if the cumulative net voyage profits computed for the period of the agree-

ment (after the payment of the basic charter hire provided herein and payment of the Charterer's fair and reasonable overhead expenses applicable to operation of the Vessels) shall be in excess of a rate of ten (10) per centum per annum on the Charterer's capital necessarily employed in the business of the Vessels during the period of the agreement (all as hereinafter defined in Clause 23) the Charterer shall pay to the Owner at Washington, D. C. within sixty (60) days thereafter, an amount equal to one-half of such cumulative net voyage profit in excess of an amount computed for the period of the agreement at the rate of ten (10) per centum per annum on such capital as hire in addition to the hire payable under Clause 12; provided, however, that such payment of additional charter hire shall be deemed to be preliminary and subject to adjustment upon the completion of final audit by the Owner, at which time such payments will be made by or to the Owner as such final audit may show to be due. The Charterer shall, (1) keep its books, records and accounts relating to the management, operation, conduct of the business of and maintenance of the vessels covered by this Agreement in accordance with the "Uniform System of Accounts for Operating-Differential Subsidy Contractors" prescribed by the United States Maritime Commission in its General Order No. 22 and under such regulations as may be prescribed by the Owner:"

The key phrase "capital necessarily employed" is defined in Clause 23:

"Clause 23: Definitions. The terms 'net voyage profit,' 'fair and reasonable overhead expenses', and 'capital necessarily employed' as used herein with respect to the operation of the Vessels and services incident thereto are hereby defined, for the purposes of this Agreement only, as follows:

\* \* \* \* \* \*

"(c) Capital Necessarily Employed shall be determined upon the basis of the net worth reported by the Charterer in its balance sheet as of the close of the month preceding the date of delivery of the first Vessel under this Agreement, adjusted as hereinafter provided. For the purpose of this determination, net worth, as stated in the balance sheet of the Charterer, shall be deemed to include capital stock, surplus and such subdivisions thereof as capital surplus, earned surplus, and accounts of like nature. Net worth, as thus stated, shall be adjusted in such manner as the Owner may determine to be fair and reasonable, including the elimination of appreciation, adequate statement of the liabilities, and such other adjustments as are consistent with sound accounting principles. In the computation of 'Capital Necessarily Employed,' good will, intangibles not actually purchased and paid for, and stock held in treasury shall be excluded.

\* \* \* \* \* \*

"If the Charterer engages in other activities in addition to the operation of the Vessels, the Owner shall determine the proper allocation of capital as between such activities. The amount so allocated to the operation of the Vessels shall be deemed to be the 'Capital Necessarily Employed.'

As of April 30, 1946, the close of the month preceding the first delivery, Isthmian's balance sheet carried as part of its "current working assets" an account of $10,816,514.17, representing a balance standing to the credit of Isthmian with U. S. Steel. The account had been in existence between the companies since 1932, earned 1% interest, and all or any portion thereof was payable to Isthmian on demand.

After redelivery of the vessels, Isthmian presented its account to the Maritime Administration, which account included as part of its "capital necessarily employed" a percentage of the $10 million account held by U. S. Steel. Isthmian therefore reported that no additional charter hire was due the Government under the contract.

However, the Maritime Administration's Comptroller disallowed the entire $10 million account with U. S. Steel from "capital necessarily employed", and claimed as additional charter hire the amount which the Government now seeks to recover from Isthmian.

The Government admits that no additional charter hire is due if the $10 million account is part of the "Charterer's capital necessarily employed in the business of the Vessels".

Likewise the Government does not contest the fact that if that final determination is based on the definitions in the charter party itself, no additional charter hire is due.

However, the Government asserts that under that portion of Clause 13 which authorizes the Maritime Administration to issue "such regulations as may be prescribed by the owner", the Government was authorized to, and in 1950 did, issue the following regulations:

Part III(c) (1), Supplement 21 to General Order 60:

"1. Wherever practicable and the result will not be disproportionate, assets (and applicable liabilities) shall be allocated directly to the operation in which they are employed. For example, such assets (and applicable liabilities) as

"(a) non-shipping inventories,

"(b) replacement and similar special funds (including contractual and statutory reserve funds of subsidized operators),

"(c) amounts on deposit under purchase contracts,

"(d) investments in related companies,

"(e) advances and loans to related companies,

"(f) non-current receivables from, and payables (not in excess of receivables) to, related companies,

"(g) net book value of vessels and of non-shipping property and equipment, less the portion of any long-term debt arising from the acquisition of such assets due more than one year after the date of the balance sheet involved,

"(h) vessels under construction,

"(i) notes and accounts receivable from officers and employees,

"(j) good will and other intangible assets, and

"(k) liability for recapture under operating-differential subsidy agreements,

are not necessarily employed in operations under WARSHIPDEMISE-OUT 203 or SHIPSALESDEMISE 303 and therefore, are not allocable to such operations."

The Government asserts that under these regulations the Maritime Administration was required to exclude the $10 million account because it was either an investment with a related company, or an advance and loan to a related company, or a non-current receivable from, and payable to a related company, and therefore "not capital necessarily employed."

In my opinion, the Government's right to additional charter hire is to be determined solely by the formula employed in Clause 13 of the charter. See American-Foreign Steamship Corp. v. United States, 2 Cir., 1958, 265 F.2d 136, 146. The regulations upon which the Government relies were issued by the Maritime Administration four years after the charter party was executed and two years after the contracts had been

carried out and the ships returned to the Government.

Throughout our history, courts have recognized the fundamental unfairness of retrospective legislation, and even though the constitutional prohibition against ex post facto laws is directed towards criminal statutes, Calder v. Bull, 1798, 3 Dall. 386, 3 U.S. 386, 1 L.Ed. 648, the courts have reached similar results with civil legislation through the impairment of contracts and the due process clauses.[1] To permit one party to a contract to change the rules so as to enable it to impose a greater burden on the other party, is even more offensive and should not be permitted even if the party seeking such change is the Government.

Here, the regulations sought to impose upon Isthmian an obligation which was neither within the scope of the original charter party nor within the contemplation of the parties. The Maritime Administration may not use these regulations to alter Isthmian's contract obligations with respect to additional charter hire. See Hunt v. United States, 1901, 257 U.S. 125, 42 S.Ct. 5, 66 L.Ed. 163; and Freund v. United States, 1922, 260 U.S. 60, 43 S.Ct. 70, 67 L.Ed. 131.

Although I have found that the libel should be dismissed on the retroactivity issue, I am also of the opinion that even if the regulations were valid and applicable, the Government would not be entitled to a judgment in its favor.

The Government's expert admitted that a demand deposit with a bank would not come within the reach of the regulations and would have been regarded by the Maritime Administration as part of the "capital necessarily employed".

Even without the assurances which the Maritime Administration, in 1946, requested and received, Isthmian's account with U. S. Steel was identical to a demand deposit and is entitled to be treated in the same manner. In addition, the specific provisions of the regulations were applicable only if "the result will not be disproportionate". In my view, the disallowance of the entire $10 million account from Isthmian's current assets "necessarily employed in the operation of the vessels" would create a disproportionate as well as an inequitable result.

The libel is dismissed.

The foregoing opinion will serve in place of findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

---

1. E. g., Fletcher v. Peck, 1810, 6 Cranch. 87, 10 U.S. 87, 3 L.Ed. 162; Ochoa v. Hernandez Y Morales, 1913, 230 U.S. 139, 33 S.Ct. 1033, 57 L.Ed. 1427; Greenblatt, Judicial Limitations on Retrospective Civil Legislation, 51 Nw.U.L.Rev. 540 (1956); Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv.L.Rev. 692 (1960).