**In re BRADFORD.**

No. 7876.

District Court, D. Maryland.

Sept. 19, 1934.

666

Wade B. Hampton, of Washington, D. C. (Robinson & Fahey, of Bel Air, Md., of counsel), for assignee and Potomac Joint Stock Land Bank of Alexandria, Va.

A. Freeborn Brown, of Bel Air, Md., and Allan H. Fisher (of Fisher & Fisher), of Baltimore, Md., for petitioner.

Robert H. Archer and Morris Rosenberg (of Tydings, Walsh, Levy & Archer), both of Baltimore, Md., for John D. Worthington et al.

CHESNUT, District Judge.

In this case the mortgage debtor, now a bankrupt, has petitioned the court to permanently stay further proceedings in a mortgage foreclosure suit in a state court, the Circuit Court for Harford County, Maryland. To that end he invokes the authority of the very recent Act of Congress amending the Bankruptcy Law, approved June 28, 1934, adding a new subsection (s) to section 75 (11 USCA § 203 (s) entitled "Agricultural Compositions and Extensions" which is itself a recent Act of Congress effective March 3, 1933 (chapter 204, § 1, 47 Stat. 1470; title 11 USC, § 203 [11 USCA § 203]). This subsection (hereinafter more fully referred to) in its most general aspect provides for a five year moratorium in the enforcement against *farmers* of mortgage and other liens.

The mortgagee resists the application for a stay on the grounds (1) that the jurisdiction of the state court having attached in the proceedings to foreclose the mortgage, this court may not validly interfere therewith and (2) subsection (s) (7) of section 75 of the Bankruptcy Act, 11 USCA § 203 (s) (7) is unconstitutional and therefore the ultimate relief which is sought may not validly be granted to the farmer bankrupt.

It further appears that the proceedings in the state court were begun on April 17, 1934, by an order to docket the mortgage foreclosure case; and on June 18th the bond of the trustee or assignee to make the sale was filed; on June 19th report of sale was filed and ratified nisi, and in the absence of exceptions would in due course have been ratified on July 19th, but exceptions to the sale on behalf of the mortgagor were filed on July 9th and the mortgage debtor's petition in this case was filed on July 17th, all in this year. The procedure for the sale was in accordance with the power for sale contained in the mortgage and the proceedings in that respect followed what is the customary Maryland County practice as distinguished from mortgage foreclosure practice usually followed in Baltimore City where the initial proceeding is the appointment by the court of a trustee to make the sale. The distinction between the county and the Baltimore City practice has been of importance heretofore in other situations arising under the Bankruptcy Law prior to the recent amendments where it was necessary to determine the time of assumption of jurisdiction by the state court, but is not of importance here because it is not disputed that on the filing of the report of sale in this case the state court jurisdiction attached, and this was prior to the filing of the petition in this court. See In re Hurlock (D. C. Md.) 23 F.(2d) 500.

As the questions raised involve the important matter of the relationship and respective jurisdictions of the state and federal courts in matters in bankruptcy, and as subsection (s) of section 75 of the Bankruptcy Law, 11 USCA § 203 (s) has so very recently been enacted and has not heretofore been judicially construed or applied, so far as I am aware, it may be useful in this case to discuss the situation that has arisen more fully than might otherwise be considered necessary, and thus give some consideration to the successive recent Acts of Congress amending the Bankruptcy Law culminating in the enactment of subsection (s) of section 75; and also to state just what the procedure heretofore has been in this particular case. ·

Effective March 3, 1933, Congress added five new sections to the Bankruptcy Law, sections 73 to 77, inclusive (11 USC, §§ 201–205 [11 USCA §§ 201–205]), section 73 (11 USCA § 201) extending the jurisdiction of the courts of bankruptcy to proceedings for the relief of "debtors" (not necessarily bankrupt); section 74 (11 USCA § 202) provided that persons other than corporations and farmers might, without necessarily being adjudicated bankrupt, file petitions as debtors "stating that he is insolvent or unable to meet his debts as they mature,. and that he desires to effect a composition or an extension of time to pay his debts." Detailed procedure looking to the confirmation or rejection of the debtor's proposition was outlined in the section. A conspicuous new feature of the law was that it directly affected claims of secured as well as unsecured creditors and might be made binding on all if confirmed by the court after approval in writing by a majority in number and amount of all creditors. By subsection (n) (11 USCA § 202 (n) the bankruptcy court "may enjoin secured creditors who may be affected by the extension proposal from proceeding in any court for the enforcement of their claims until the extension has been confirmed or denied by the court." But by section 74, subsec. (h), 11 USCA § 202 (h), the proceeding is effective only against secured debts, the security for which is in the actual or constructive possession of the debtor or of the custodian or receiver.

In several recent federal decisions this section has been construed and applied and has been held constitutional and valid as against objections to the effect that it was not within the power of Congress because the subject matter legislated on was not covered by the term "bankruptcies" in article 1, § 8, cl. 4, of the Constitution, in the grant of specific powers to Congress. In re Landquist (C. C. A. 7) 70 F.(2d) 929; In re Burgh (In re Parmenter) (D. C. Ill.) 7 F. Supp. 184; In re Weissbaum (D. C. Calif.) 2 F. Supp. 967; In re Collier (D. C. N. Y.) 4 F. Supp. 700; In re Doelger (D. C. N. Y.) 6 F. Supp. 776; In re Looker (D. C. Pa.) 6 F. Supp. 571, 24 A. B. R. (N. S.) 440. Compare In re Conciliation Commissioner (D. C.) 5 F. Supp. 131. In several of these cases state court proceedings were enjoined under varying circumstances. We are not directly here concerned with section 74 (11 USCA § 202) except in its bearing on the progressive extension of the field of bankruptcy legislation by Congress, and the attitude of the courts regarding it.

Section 75 (11 USCA § 203) (with which we are directly concerned) covers the subject of "Agricultural Compositions and Extensions." It relates only to farmers but otherwise in general follows the plan of section 74 (11 USCA § 202) which relates to individuals other than farmers and corporations. It differs from section 74 in the provision that the functions of referees are to be performed by commissioners appointed by the court to be known as Conciliation Commissioners, who, however, were by the original Act to be appointed only upon petition of at least fifteen farmers within any one county. But by further amendment effective June 7, 1934 (H. R. 5884, § 8 [11 USCA § 203 (a)]) it was provided that the court should appoint "one or more referees to be known as conciliation commissioners for each county having an agricultural population of 500 or more farmers" with certain further related provisions. Section 75 also differs importantly from section 74 in the provision made with regard to stay of suits in other courts. In subsection (o), 11 USCA § 203 (o), it is provided "Except upon petition made to and granted by the judge after hearing and report by the conciliation commissioner, the following proceedings shall not be instituted, or if instituted at any time prior to the filing of a petition under this section, shall not be maintained, in any court or otherwise, against the farmer or his property, at any time after the filing of the petition under this section, and prior to the confirmation or other disposition of the composition or extension proposal by the court:

"(1) Proceedings for any demand, debt, or account, including any money demand;

"(2) Proceedings for foreclosure of a mortgage on land, or for cancellation, rescission, or specific performance of an agreement

for sale of land or for recovery of possession of land;

"(3) Proceedings to acquire title to land by virtue of any tax sale;

"(4) Proceedings by way of execution, attachment, or garnishment;

"(5) Proceedings to sell land under or in satisfaction of any judgment or mechanic's lien; and

"(6) Seizure, distress, sale, or other proceedings under an execution or under any lease, lien, chattel mortgage, conditional sale agreement, crop payment agreement, or mortgage."

The composition or extension, as in the case under the prior section, is not to be effective unless confirmed by the court after securing approval of a majority in amount and number of creditors, including secured creditors, and it is again provided as in the former section, "that such composition or extension shall not reduce the amount of or impair the lien of any secured creditor, but shall affect only the time and method of its liquidation."

Section 76 (11 USCA § 204) provided for the extension of the obligations of persons who were secondarily liable for debts; and section 77 (11 USCA § 205) provided for "reorganization of railroads engaged in interstate commerce," with neither of which we are here concerned.

Somewhat similar provisions for financially embarrassed municipalities were enacted as part of the Bankruptcy Act constituting sections 78, 79 and 80, by Act of Congress (H. R. 5950) approved May 24, 1934 (11 USCA §§ 301–303). And a further amendment (H. R. 5884) approved June 7, 1934, made somewhat parallel provisions for the case of re-organization of corporations, by sections 77A and 75B (11 USCA §§ 206, 207), with neither of which we are here concerned, except section 8 of the later Act with regard to the appointment of conciliation commissioners in farmers' proceedings which has already been mentioned.

The final Act and the one most directly involved in this proceeding is the addition to section 75 of subsection (s) approved June 28, 1934 (S. 3580), 11 USCA § 203 (s). For convenience it is set out in extenso in the margin.[1]

---

[1] "(s) Any farmer failing to obtain the acceptance of a majority in number and amount of all creditors whose claims are affected by a composition or extension proposal, or if he feels aggrieved by the composition or extension, may amend his petition or answer asking to be adjudged a bankrupt. Such farmer may, at the time of the first hearing, petition the court that all of his property, whether pledged, encumbered, or unencumbered, by liens or otherwise, be appraised, and that his exemptions as prescribed by the State law, subject to any liens thereon, be set aside and that he be allowed to retain possession of any part or parcel or all of the remainder of his property and pay for same under the terms and conditions set forth in this subsection (s).

"(1) Upon such a request being made in the petition or answer, at the time of the first hearing, appraisers shall be designated and appointed. Such appraisers shall appraise all the property of the debtor at its then fair and reasonable value, not necessarily the market value at the time of such appraisal. The appraisals shall be made in all other respects, with right of objections, exceptions, and appeal, in accordance with this act: Provided, That in case of real estate either party may file objections, exceptions, and appeals within one year from date of order approving the appraisal.

"(2) After the value of the debtor's property shall have been fixed by the appraisal as herein provided, the referee shall issue an order setting aside to such debtor his exemptions as prescribed by the State law, subject to any existing mortgages or liens upon any such exemptions to an amount equal to the value, as fixed by the appraisal, of the value of such exempt property as is covered by any mortgage or lien, and shall further order that the possession, under the control of the court, of any part or parcel or all of the remainder of the debtor's property, shall remain in the debtor subject to a general lien, as security for the payment of the value thereof to the trustee of the creditors, if a trustee is appointed, such a lien to be subject to and inferior to all prior liens, pledges, or encumbrances. Such prior liens, pledges, or encumbrances shall remain in full force and effect, and the property covered by such prior liens, pledges, or encumbrances shall be subject to the payment of the claims of the secured creditors holding such prior liens, pledges, or encumbrances up to the actual value of such property as fixed by the appraisal provided for herein. All liens herein on livestock shall cover all increase, and all liens on real property shall cover all rental received or crops grown thereon by the debtor, as security for the payment of any sum that may be due or past

In condensed substance it provides that a farmer, having filed a petition under section 75 for composition or extension of his debts, who fails to obtain the approval of his creditors "may amend his petition or answer asking to be adjudged a bankrupt," and at the

due under the terms and provisions of the next paragraph, until the full value of any such particular property has been paid.

"(3) Upon request of the debtor, and with the consent of the lien holder or lien holders, the trustee, after the order is made setting aside to the debtor his exemptions, shall agree to sell to the debtor any part, parcel, or all of the remainder of the bankrupt estate at the appraised value upon the following terms and conditions, and upon such other conditions as in the judgment of the trustee shall be fair and equitable:

"a. Payment of 1 per centum interest upon the appraised price within one year from the date of said agreement.

"b. Payment of 2½ per centum of the appraised price within two years from the date of said agreement.

"c. Payment of an additional 2½ per centum of the appraised price within three years from the date of said agreement.

"d. Payment of an additional 5 per centum of the appraised price within four years from the date of said agreement.

"e. Payment of an additional 5 per centum of the appraised price within five years from the date of said agreement.

"f. Payment of the remaining unpaid balance of the appraised price within six years from the date of said agreement.

"Interest shall be paid on the appraised price and unpaid balances of the appraised price yearly as it accrues at the rate of 1 per centum per annum and all taxes shall be paid by the debtor.

"The proceeds of such payments on the appraised price and interest shall be paid to the lien holders as their interests may appear, and to the trustee of the unsecured creditors, as their interests may appear, if a trustee is appointed.

"(4) An agreement having been reached as provided in subsection (3), the debtor may consume or dispose of any part or parcel or all of said property whether covered by the general lien to the trustee, if a trustee is appointed, or subject to pledges or prior liens or encumbrances held by secured creditors, provided he pays the appraised value of such part or parcel or all, as the case may be, to the secured creditors, as their interests may appear, and the trustee of the unsecured creditors, as his interests may appear, if a trustee is appointed, or he may put up a bond approved by the referee in bankruptcy that he will make payments, as provided for herein, of any property so consumed or disposed of.

"(5) In case the debtor fails to make any payments, as herein provided, to any or all of the secured creditors or to the trustee of the unsecured creditors, then such secured creditors or the trustee may proceed to enforce their pledge, lien, or encumbrances in accordance with law. It shall be the duty of the secured creditors and of the trustee of the unsecured creditors to discharge all liens of record in accordance with law, whenever the debtor has paid the appraised value of any part, parcel, or all of his property as herein provided.

"(6) Having complied with the provisions of subsection (3), the debtor may apply for his discharge as provided in this act.

(7) If any secured creditor of the debtor, affected thereby, shall file written objections to the manner of payments and distribution of debtor's property as herein provided for, then the court, after having set aside the debtor's exemptions as prescribed by the State law, shall stay all proceedings for a period of five years, during which five years the debtor shall retain possession of all or any part of his property, under the control of the court, provided he pays a reasonable rental annually for that part of the property of which he retains possession; the first payment of such rental to be made within six months of the date of the order staying proceedings, such rental to be distributed among the secured and unsecured creditors, as their interests may appear, under the provisions of this act. At the end of five years, or prior thereto, the debtor may pay into court the appraised price of the property of which he retains possession: Provided, That upon request of any lien holder on real estate the court shall cause a reappraisal of such real estate and the debtor may then pay the reappraised price, if acceptable to the lien holder, into the court, otherwise the original appraisal price shall be paid into court and thereupon the court shall, by an order, turn over full possession and title of said property to the debtor and he may apply for his discharge as provided for by this act: Provided, however, That the provisions of this act shall apply only to debts existing at the time this Act becomes effective [June 28, 1934].

"If the debtor fails to comply with the provisions of this subsection the court may order the trustee to sell the property as provided in this title."

first hearing thereafter may petition the court that his property, whether encumbered by liens or otherwise, be appraised; that his exemptions be set aside and that he be allowed to retain possession of all or a part of his property under the conditions thereafter stated. In that event appraisers shall be appointed who shall appraise the property "at its then fair and reasonable value, not necessarily the market value at the time of such appraisal. The appraisals shall be made in all other respects, with right of objections, exceptions, and appeal, in accordance with this act: Provided, That in case of real estate either party may file objections, exceptions, and appeals within one year from date of order approving the appraisal." After the value of the property "shall have been fixed by the appraisal" and the debtor's exemptions are set aside, the referee "shall further order that the possession, under the control of the court, of any part or parcel or all of the remainder of the debtor's property, shall remain in the debtor subject to a general lien, as security for the payment of the value thereof to the trustee of the creditors, if a trustee is appointed, such a lien to be subject to and inferior to all prior liens, pledges, or encumbrances"; the latter to remain in full force and effect and "shall be subject to the payment of the claims of the secured creditors holding such prior liens, pledges, and encumbrances *up to the actual value of such property* as fixed by the appraisal provided for herein." Thereafter, upon request of the debtor and *with the consent* of the lienors the property may be sold to the debtor upon the partial payment plan provided for in subsection 3; but by subsection 7, if a secured creditor objects to the sale, then the court "shall stay all proceedings for a period of five years, during which five years the debtor shall retain possession of all or any part of his property, under the control of the court, provided he pays a reasonable rental annually for that part of the property of which he retains possession; the first payment of such rental to be made within six months of the date of the order staying proceedings. * * * At the end of five years, or prior thereto, the debtor may pay into court the appraised price of the property of which he retains possession:" provided that the lienholder may then have a reappraisal of the property and the debtor may then "pay the reappraised price, if acceptable to the lien holder, into the court, otherwise the original appraisal price shall be paid into court, and thereupon the court shall, by an order, turn over *full possession and title* of said property to the debtor and he may apply for his *discharge* as provided for by this act: Provided, however, That the provisions of this subsection shall apply only to debts existing at the time this Act becomes effective [June 28, 1934]."

The proceedings in this particular case have been as follows: On July 17, 1934, the debtor filed his petition stating his desire to effect a composition or extension of time to pay his debts "under section 75 of the Bankruptcy Act as amended by subsection (s) of said Act approved June 28, 1934," and asking a stay of proceedings against him in other courts and particularly a stay of the mortgage foreclosure suit above mentioned. On this petition an order was passed granting the stay unless cause to the contrary was shown on or before the 27th of July, after service of copy on the mortgage assignee; on July 27th the latter, and also separately the purchaser of the property at the mortgage foreclosure sale (which, however, had not been finally ratified), filed objections to the stay of the proceeding; and thereafter the issue thus made was set for hearing on September 6, 1934, and was then heard. In the meantime, the papers in the case in due course had been referred to Stewart O. Day, as Conciliation Commissioner and the petitioner filed on July 24, 1934, a schedule of debts and assets from which it appeared that his debts consisted of $25,003 and his assets of $71,195; but later on August 10, 1934, an inventory of assets and liabilities was filed which, disregarding the mortgage property as an asset and the mortgage as a liability, showed assets of about $2,650 and liabilities of about $24,000, the former schedule being based on mistaken information. In this inventory the mortgaged property was valued at $37,000 and the mortgage debt listed at $20,000. It elsewhere appears that at the mortgage foreclosure sale the property was sold for $21,500, an amount approximately sufficient to pay the principal and interest of the mortgage and expenses of the sale.

At the beginning of the hearing in court on September 6, 1934, the petitioner in accordance with subsection (s) of section 75 of the Bankruptcy Act, filed an amended petition stating that he had failed to obtain the acceptance of a majority in number and amount of all creditors and therefore now "asks to be adjudged a bankrupt, as provided by subsection (s) of section 75 of said Bankruptcy Act," and also petitions that his property may be appraised, his exemptions set aside and that he be allowed to retain pos-

session of all the remainder of his property and pay for the same under the terms and conditions set forth in subsection (s). He further alleges, referring to the mortgage foreclosure proceedings, that "the value of the farm is far in excess of the mortgage upon it; that the price at which said farm was sold was grossly inadequate and far below the true value of the farm" and prayed for a permanent stay of and injunction against the further prosecution of the mortgage foreclosure proceedings and all other proceedings against him at law and equity.

The mortgage creditor in this case, the Potomac Joint Stock Land Bank of Alexandria, and the purchasers, John D. Worthington and Annie C. Worthington, his wife, separately represented by counsel at the hearing, did not oppose the filing of the amended petition but do oppose the application for a stay of the mortgage foreclosure proceedings, as does the mortgage assignee, Michael W. Fahey, as the representative of the mortgagee.

At the hearing the petitioner offered some oral testimony for the purpose of establishing the allegation that the mortgaged property had a fair value much in excess of the sale price. From a fair consideration of the testimony submitted I find the following facts. The mortgaged property consists of farm lands embracing 145 acres situated in Harford County immediately adjoining the town of Belair, which is the county seat, and the property lies within a few hundred yards of the County Court House and fronts to a considerable extent on one of the main streets or roads of Belair. The improvements consist of a substantial stone house containing 12 or more rooms, modern improvements, and substantial farm outbuildings, all of which are said to be insured for approximately $19,000 and would doubtless cost at least that much to re-construct. The portion of the property which fronts on the public road embracing perhaps 10 to 12 acres of the whole property may possibly be available within the next few years for sale as town lots at a price which might produce $10,000 to $12,000 or a little more. Viewed as farm lands only the price of $50.00 to $75.00 an acre would be reasonable for the property, and viewed as a farm only the buildings do not add very greatly to the reasonable price per acre for farm lands as that price is usually inclusive of suitable buildings. I conclude on the point of values that the sale price fairly represents the present market value of the property although it is

entirely possible a general enhancement in price of farm lands or the possible sale of some part of this property for town lots in the next five years might enable the owner of the property to realize for the whole of it a sum substantially in excess of the sale price of $21,500.

The testimony taken also shows that the property has been occupied by the petitioner's family for many years past and was originally part of a much larger farm property. Prior to 1925 it was owned by petitioner's father and was then sold by reason of the latter's financial difficulties and bought in at the sale by the son, the present petitioner, for $37,500. Since then it has been continued as the family home and the farm operated by the petitioner, but at no time has the result of farming operations been sufficient either in gross or net earnings, to require, in the opinion of the petitioner, the filing of an income tax return, and it is obvious from his testimony little, if any, profit has ever been made from his farming operations and each year since 1930 has entailed apparently a substantial loss. At the present time the chief utility of the property is in connection with dairy farming, the petitioner having about twenty cows, of which, however, he owns only six. He suggests that his gross receipts and it is hoped his net earnings, may be increased hereafter by enlarging the size of the dairy herd. Except for this possibility, bearing in mind that his present assets, excluding the farm property and the mortgage thereon, consists of property in value not more than $2,650 with liabilities of about $24,000, and the failure of the farming proposition to yield any net revenue in recent years (due very probably to the high overhead expense, resulting from the high plant investment) it is not at all clear how the farm can be made to be self-sustaining or the petitioner able to pay a reasonable rental for the property unless he receives assistance from outside sources, of which he states he has some prospect. The foreclosure proceeding seems to have been in no way oppressive as it was not instituted until after repeated defaults and then only after ample notice and opportunity given the mortgagor to refinance. The mortgagor is still in actual possession of the property.

These findings of fact from the testimony offered probably have little relevancy to the legal proposition before the court under the provisions of subsection (s) (7) which apparently gives no discretion to the court except in the determination of what constitutes a fair rental for the property, and possibly

in the approval or rejection of the price for which the property may be appraised.

■■ Turning now to the legal issue raised by the petition for a stay of the mortgage foreclosure proceeding and the opposition thereto, the first objection is that the state court having obtained jurisdiction prior to the institution of these proceedings, this court has no power to interfere therewith. This proposition is sound under the administration of the general bankruptcy law if the case does not come under the recent amendments; and indeed is exactly in accordance with what has been for many years the established practice of this court. Thus in Re Hurlock (D. C.) 23 F.(2d) 500, 501, Judge Soper, as District Judge, said: "It is well settled that, if a suit in a state court to foreclose a valid mortgage is commenced before a petition in bankruptcy is filed against the mortgagor, it may be prosecuted in the state court without interference from the court of bankruptcy." (Citing numerous cases.) "The rules of comity apply, and the first court to secure possession and custody of the property, through its officers, has exclusive jurisdiction to hear and determine all controversies in regard thereto." And later, in Straton v. New, 283 U. S. 318, 51 S. Ct. 465, 75 L. Ed. 1060, this view was affirmed by the Supreme Court. See particularly the note on page 326 of 283 U. S., 51 S. Ct. 465, 468, where it is said: "On similar grounds the bankruptcy courts refuse to enjoin the prosecution of foreclosure proceedings under a mortgage, the lien of which is preserved in bankruptcy, if initiated prior to the date of the petition." But these decisions had reference to situations arising under the bankruptcy law where it did not undertake to interfere with the liens of secured creditors, and where the state and federal courts had *concurrent* jurisdiction. It is a general principle that in such cases the court that first acquires the possession of the property will be permitted to finally dispose of all questions affecting it. However, a different principle applies in the relation of the state and federal courts where by virtue of congressional legislation within the constitutional power, the federal courts are vested with *exclusive* jurisdiction under paramount legal authority. Thus, as the Bankruptcy Act avoided liens obtained within four months prior to bankruptcy, a state court proceeding to enforce such a lien or the assumption of jurisdiction within that period by the appointment of a receiver necessarily terminated upon the filing of the petition in bankruptcy within the four months

period. See Gross v. Irving Trust Company, 289 U. S. 342, 53 S. Ct. 605, 77 L. Ed. 1243, 90 A. L. R. 1215. But the new amendments to the Bankruptcy Act materially changed the status of secured creditors and extend exclusive jurisdiction of bankruptcy over them and expressly provide for the stay of state court proceedings affecting them. It is true that in section 74 a limitation to this proposition is found in subsection (1) which has been construed by the Circuit Court of Appeals for the Seventh Circuit in Re Landquist, 70 F.(2d) 929, 935, 936, to restrict the authority of the district court to stay state court proceedings to those cases where the bankrupt debtor is in the actual or constructive possession of the property subject to the lien at the time of filing the bankruptcy proceedings. It was there held that a mortgage foreclosure proceeding in a state court could not properly be enjoined by a federal court where the mortgagor had surrendered possession of the mortgaged premises to the trustee under the trust deed and who, in turn, had delivered possession of the property to a receiver appointed by the state court more than four months prior to the filing of debtor's petition for an extension. See also to same effect Molina v. Murphy (C. C. A. 1) 71 F.(2d) 605. Illustrations of stay orders affecting state court litigation authorized by this section may be found in the cases of In re Looker (D. C.) 6 F. Supp. 571, 24 A. B. R. (N. S.) 440; In re Collier (D. C.) 4 F. Supp. 700, and In re Weissbaum (D. C.) 2 F. Supp. 967. As already outlined, the provision under section 75, with which we are here concerned, regarding the stay of state court suits, is materially different from that under section 74. Under the latter the stay is to be ordered only in the discretion of the district court, on such notice and on such terms, if any, as it deems fair and equitable; but under section 75, subsection (*o*) there is a self-executing provision that the proceedings therein mentioned (including mortgage foreclosure sales) in any court shall not be maintained, "except upon petition made to and granted by the judge after hearing and report by the conciliation commissioner," although the duration of this prohibition is limited to the time "prior to the confirmation or other disposition of the composition or extension proposal by the court."

■ Counsel for the bankrupt contends for the stay under section 75, subsections (*o*) and (s) (7). As to (*o*) it is correctly pointed out on behalf of the mortgage creditor and the purchaser of the property that the

stay of proceedings there authorized is no longer applicable under the changed condition brought about by the debtor's amended petition which states that the proposition for composition and extension has failed; and it is argued that subsection (s) now invoked does not expressly authorize a stay of other court proceedings. Counsel for the bankrupt, however, contends that section 7 of subsection (s) does authorize the stay in the phrase "shall stay all proceedings for a period of five years." It is not entirely clear whether the words "all proceedings" refer to the proceedings in the bankruptcy case or proceedings in other courts. It is said by counsel for the bankrupt here that subsection (s) must be read as a continuation of section 75, with which it is in pari materia, although enacted more than a year later, and that so considered the more reasonable construction in view of the general subject matter is to give the phrase "all proceedings" the larger rather than the narrower meaning. On the whole I regard this is the more rational construction and adopt it. It follows, therefore, that the stay is authorized by the subsection (s), unless it is unconstitutional, or unless the title to the property had passed from the debtor by virtue of the foreclosure proceedings before the filing of the petition in this case. In subsection (n) of section 75, 11 USCA § 203 (n), the provision is "the filing of a petition pleading for relief under this section shall subject the farmer and his property, wherever located, to the exclusive jurisdiction of the court." Obviously, if the farmer, prior to the bankruptcy proceeding had in good faith and for consideration sold and conveyed away his property, it would not be subject to the jurisdiction of the bankruptcy court. The contention of the purchaser and of the mortgagee is that the legal effect of the mortgage foreclosure proceeding accomplished this. Thus it is pointed out that the state court had assumed jurisdiction, that the mortgage assignee had in fact made a sale and reported it to the court, and the court had ratified it nisi subject to the filing of exceptions, and that in ordinary course the sale would have been finally ratified unless well grounded legal exceptions had been filed; and it is further said that as the sale was entirely regular and the price was reasonable and certainly not grossly inadequate, ratification in due course would almost surely have followed in this case. It is said also on behalf of the purchasers who have so far complied with the terms of the sale and have paid $2,000 or more on account, that they have acquired substantial individual rights which may not be disregarded. This issue must, I think, be determined by the Maryland cases which describe the legal situation affecting the property as it existed when the petition in bankruptcy was filed. From the decisions of the Court of Appeals of Maryland it is clear that the legal status of the purchaser with regard to the property was merely that of one who had submitted a pending offer which had not been accepted. Thus in Whitely v. Whitely, 117 Md. 538, 544, 84 A. 68, 70, it was said: "Both public and private sales reported by trustees under decrees of court are subject to the approval of the court, and, until ratified, any sale is only an offer to purchase." See Loft, Inc., v. Seymer, 148 Md. 638, 645, 129 A. 911; and in Mizen v. Thomas, 156 Md. 313, 322, 144 A. 479, 483, Judge Offutt, speaking for the court, said: "The bid of the purchaser, its acceptance, the report of the trustee, and its final ratification by the court, are all successive steps in the formation and completion of a perfect and binding contract of sale, but do not amount in themselves to an actual sale. Nor can the property be treated as actually sold until the terms of sale have been met or waived and the purchaser has received or is entitled to receive a conveyance thereof; for until then the title to the property is still in the mortgagor, and the only interest acquired by the purchaser is the right to receive a conveyance of the property upon complying with the terms of sale."

In article 66, § 11 (Mortgages) Bagby's Annotated Code of Maryland, it is provided: "All such sales, when confirmed by the court and the purchase money is paid, shall pass all the title which the mortgagor had in the said mortgaged premises at the time of the recording of the mortgage." It is, I think, entirely clear under the Maryland statutory and case law that the equitable title of the mortgage debtor had not passed from him, by reason of the state court proceedings, at the time of the filing of the petition in this case, nor indeed up to the present time as the sale has not been finally ratified by the court; and, of course, the purchase money has not been paid; nor has the deed been delivered. Consequently it must be held that the property is still that of the debtor subject, of course, to the legal consequences of the mortgage. The first objection to the stay order should, therefore, be overruled, if the remaining objection which asserts the unconstitutionality of section 75, subsec. (s) (7) is not to be sustained.

■ Preliminarily it may be suggested that this question of constitutionality is not necessarily involved at the immediate time because it depends upon future developments whether the bankrupt in this case does in fact offer to purchase the mortgaged property at its appraised price in accordance with subsection (s) (3), at the first meeting called and held by the referee; and it 'may further be said that if at that time the bankrupt does elect to purchase the property the secured creditor may consent and not object to the terms in which event, of course, he would have no standing to complain of the alleged unconstitutionality of the Act. But at the hearing it was formally and definitely stated by counsel for the bankrupt that the election to purchase would be made, and by counsel for the mortgagee that it did and would object and not consent thereto. It is obvious that the issue must be met and decided.

The specifications in support of the alleged unconstitutionality of this recent Act are (1) that it is not within the affirmative grant of power given to Congress by the Constitution, article 1, § 8, cl. 4, reading "to establish * * * uniform Laws on the subject of Bankruptcies throughout the United States"; and (2) is prohibited by the Fifth Amendment to the Constitution which provides that no person shall "be deprived of life, liberty, or property, without due process of law."

■ With regard to the first specification, it will be admitted that the provision now made constituting in substance a five year moratorium for farmers is novel and without precedent in our bankruptcy legislation; but this consideration does not conclude the question as to whether the subject-matter is fairly germane to bankruptcy legislation. As already noted, the whole of this sequence of recent amendments to the bankruptcy law very greatly extends the field which has previously been occupied by congressional legislation upon the subject of bankruptcy. A review of English and American statutory and case law indicates that the permissible field of such legislation is much wider than was in fact covered by the original Act of 1898. See review of the subject by the Circuit Court of Appeals for the Seventh Circuit in Re Landquist, 70 F.(2d) 929, 931–933. While subsection (s) still further extends the limits of the bankruptcy legislation, I am not able to say that the provision therein made is clearly not sufficiently germane to the subject of bankruptcy to be within the proper limits of the power conferred by the Constitution on Congress, so far as the subject-matter itself is concerned. It is familiar constitutional law that the act is not to be held invalid because unconstitutional unless clearly so.

■ The second specification raises a much more difficult and serious question. The exercise of the bankruptcy power by Congress, as is the case with other delegated powers, is subject to the requirement of the due process clause of the Fifth Amendment. Monongahela Nav. Co. v. United States, 148 U. S. 312, 336, 13 S. Ct. 622, 37 L. Ed. 463; Nichols v. Coolidge, 274 U. S. 531, 542, 47 S. Ct. 710, 71 L. Ed. 1184, 52 A. L. R. 1081; Hanover Nat. Bank v. Moyses, 186 U. S. 181, 192, 22 S. Ct. 857, 46 L. Ed. 1113. Putting aside certain obscurities in the meaning of particular phraseology, the more substantial and important provisions of the enactment with relation to its constitutionality are, first, the provision for a five year moratorium, with requirement of the payment by the farmer of the fair rental value of the property subject to the lien during that period, and, secondly, the provision for the ultimate and final acquisition of the property by the farmer upon the payment of the appraised price. Are these requirements valid in view of the due process clause?

■ To determine the effect of the Act it is desirable to state the rights of the mortgage creditor in Maryland prior to the Act and to compare therewith his rights under the Act as written. The principles of common law and equity are substantially still applicable to the mortgage security under the Maryland law. The effect of the mortgage is to transfer the legal title to the property to the mortgagee, but commonly, as in this case, possession is retained by the mortgagor until default, and consequent sale under foreclosure proceedings, under the jurisdiction and authority of a court of equity, in which the property is sold to the highest bidder. After final ratification of the sale and payment of the purchase price the property is conveyed by deed to the purchaser. Where the property does not bring the amount of the mortgage debt, it is the right of the mortgagee to buy in the property for himself, if he is the highest bidder, and to pay for it by application of the mortgage debt. If there is a deficiency in the amount due on the mortgage, the mortgagee is entitled to a money decree against the mortgagor therefor. In equity the property is regarded in substance only as a security for the debt, but after the sale is made there is no further period allowed under the Maryland law for redemption of the mortgage by the mortgagor. The most important feature of the mortgage security is

the right of the mortgagee to retain the title to the property until his whole debt is paid, and failing that, to become the absolute owner, through the sale in equity if he is the highest bidder, as he very commonly is unless the property sells for an amount sufficient to pay the mortgage debt and expenses of sale.

Contrasted with these rights under the Maryland law we find (and substantially the same is believed generally to prevail elsewhere in this country) that subsection (s) (7) makes very substantial changes in the rights of the mortgagee.

█ The most important are: (1) His right to realize on the security, in event of default, is suspended for five years. This period is fixed and absolute, without relation to the continuance of or change in existing conditions, and without judicial determination of adequate cause, or power of change to adjust to altered conditions; (2) at the end of the period the title to the security is transferred to the mortgagor upon payment of a sum determined by appraisers (subject to a somewhat uncertain judicial review) and which may be for an amount substantially less than the mortgage debt; (3) no provision is made for a deficiency claim by the mortgagee against the bankrupt's estate; (4) during the five year period a reasonable rental is to be paid, but the first payment is to be deferred for six months without security therefor, other than sale upon default. The effect of this may be at least a six months moratorium without *any* compensation therefor to the mortgagee, during which time the mortgagor retains the use and enjoyment of the property.

It is obvious that the changes are material and prejudicial to the mortgagee, and not only his remedies but also his substantial rights are materially impaired. This is convincingly illustrated by the reason for including, in the last lines of the Act, the provision that "this Act shall apply only to debts existing at the time this Act becomes effective." It appears from the Congressional Record that on June 16, 1934, objection was made in the Senate that the bill, which in its then form did not include this proviso, would destroy the farmers' future mortgage credit. The bill was then sent to Conference and amended and passed.

One effect of the Act is correctly described in the Senate Judiciary Committee Report dated May 28, 1934, as to "scale down existing farm indebtedness to the present value of his property." The result is obviously a "partial cancellation of the debt," and necessarily the impairment of the integrity and terms of the mortgage indebtedness. In another aspect the substantial effect is to transfer the property of one person to another by requiring the mortgagee to sell his interests in the property *to the mortgagor* at a price which the former has no part or influence in fixing. It is quite like taking private property for *private* use. Such legislation, whether federal or state, is quite "subversive of the most fundamental principles of the social compact," and more specifically, is not consistent with due process of law. Instances of condemnation by the Supreme Court of acts which have such effect are not lacking. Ochoa v. Hernandez y Morales, 230 U. S. 139, 161, 33 S. Ct. 1033, 57 L. Ed. 1427; Missouri Pac. Ry. Co. v. State of Nebraska, 164 U. S. 403, 417, 17 S. Ct. 130, 41 L. Ed. 489; Citizens' Sav. & Loan Association v. Topeka, 20 Wall. 655, 664, 22 L. Ed. 455; Gunn v. Barry, 15 Wall. 610, 21 L. Ed. 212; In re Dillard, 2 Hughes, 190, Fed. Cas. No. 3912.

It is argued that support for the law may be found in the well known "Rent Cases" in the Supreme Court; Block v. Hirsch, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877; Levy Leasing Co., Inc., v. Siegel, 258 U. S. 242, 42 S. Ct. 289, 66 L. Ed. 595; and in the more recent Minnesota Mortgage Moratorium Case (Home B. & L. Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481). These cases do decide that in a legislatively declared emergency directly affecting the public interest, laws of temporary duration, proportioned to the emergency, and terminating with it in effectiveness, may validly create a reasonable moratorium against the enforcement of their legally valid claims by landlords and mortgagees, on condition of payment to them of the reasonable rental value of the property during the period of the moratorium. Contracts, like other property, must yield somewhat to paramount public interests, but the extent of the permissible interference must be judicially determined by public, not private, or even class interests, and must be only such as is reasonable and appropriate thereto. The Rent Cases, said Mr. Justice Holmes (who wrote the opinion in the first two) in the later case of Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 416, 43 S. Ct. 158, 160, 67 L. Ed. 322, 28 A. L. R. 1321, "went to the verge of the law." The present Act goes

much further. Nor is the present Act consistent with the limitations in principle for such legislation. announced in the Blaisdell Case. There are important differences here both in degree and legal kind, as contrasted with the Minnesota mortgage moratorium law. There the time could not exceed two years and one month and was not arbitrarily fixed at all but to be determined by the court and was terminable sooner if conditions warranted. And, even more importantly, merely the time for the exercise of the right of redemption by the mortgagee (that is the full payment of the debt) might be extended by the court, *and the integrity of the mortgage contract was not otherwise impaired.* There was no authorized "scaling down" or "partial cancellation" of the debt; and the law applied uniformly to all mortgages and not alone to those of one specially favored class. In the later case of W. B. Worthen Co. v. Thomas, 292 U. S. 426, 54 S. Ct. 816, 818, 78 L. Ed. 1344, holding unconstitutional the Arkansas exemption statute, the Supreme Court was at pains to point out that the decision in the Blaisdell Case was not to be construed to "permit the State to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them."

I am not unmindful of the considerations of a public nature which induced the passage of this Act by Congress, and in view of its obvious importance to great numbers of people in the country, both mortgage debtors and creditors of farm property, I have considered the validity of the Act as applied to them respectively to the very best of my ability in the light of the settled principles of our fundamental law. It is properly with the greatest reluctance that the courts hold invalid a legislative enactment on such an important subject, and it is to be done only in what is determined to be a clear case. But where the latter conclusion is reached after full consideration, it is imperative duty of the judicial branch of the government to declare the law invalid if not consistent with the Constitution, which is the fundamental law of the land. It is not doubted that it would have been and now is open to Congress to pass a moratorium law for farmers or other debtors, as a further amendment of the Bankruptcy Law, within the principles so clearly outlined by the Supreme Court in the Minnesota Case. Such legislation, as there explained, is rightly to be considered, under the then prevailing emergency circumstances, as fairly in the interest of both debtors and creditors. But this cannot be said of the Act in question which far transcends any similar legislation which, so far as I am aware, has ever received the judicial approval of our highest Court. I am therefore compelled to reach the conclusion that subsection (s) (7) of section 75 of the Bankruptcy Act is unconstitutional in so far as it applies to the mortgage creditors of farm property.

I have considered whether there is any other principle or authority on which a further stay of the foreclosure proceedings could be based by an order of this court, but find none. The stay authorized by section 75, subsection (*o*) is definitely limited to the pendency of a proposition for composition or extension which, in this case, has terminated. As pointed out in the Blaisdell Case, 290 U. S. 446, 54 S. Ct. 231, 243, 78 L. Ed. 413, 88 A. L. R. 1481: "In the absence of legislation, courts of equity have exercised jurisdiction in suits for the foreclosure of mortgages to fix the time and terms of sale and to refuse to confirm sales upon equitable grounds where they were found to be unfair or inadequacy of price was so gross as to shock the conscience." But in this case, under the circumstances stated, this court does not have general equity jurisdiction in the matter because the state court of concurrent jurisdiction has already assumed it and, for the reasons stated, the recent bankruptcy amendments do not, in this case, operate to supersede the state court jurisdiction.

I must, therefore, decline to grant the stay.