Comunidad Religiosa Católica de Reverendas Madres Carmelitas Calzadas, Inc., de San Juan, P. R., demandante y apelada, *v.* Ramón Fernández Pérez y su esposa Ana María Carballo, demandados y apelante el primero.

Núm. 8498.—*Sometido:* Julio 23, 1942. *Resuelto:* Noviembre 30, 1942.

134

*Angel A. Vázquez,* abogado del apelante; *José Benet;* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

La demandante en este caso entabló una demanda solicitando (*a*) una declaración de nulidad de la cancelación hecha por el registrador de la propiedad de un censo que gravaba cierta propiedad inmueble; (*b*) la reinscripción en el Registro

del censo en cuestión; y (c) el cobro de los réditos que no habían sido pagados desde la fecha de la cancelación del censo. La corte de distrito dictó sentencia a favor de la demandante en cuanto a los incisos (a) y (c), y un demandado ha apelado.

La corte inferior expuso correctamente los hechos como sigue:

"En los libros antiguos de la Anotaduría de Hipotecas a cargo del Registrador de la Propiedad de San Juan aparece un asiento que reza como sigue:

" 'Ciudad—Censo—675—Manl. Ayala, como pral: Domingo Andino, Tomás Dapena, y María de los Reyes Caveza, su consorte, como sus fiadores, todos de este vecindo, pr. escrita. otorga. ante Dn. Franco. de Acosta Cuño, Rl. pp.co. a los cinco de este preste. mes y año, se constituyen. y oblig.n al censo pral. de seiscientos setenta y cinco ps. de cappnia. correspondtes. al Convto. de M. Monjas de esta Capital; y son los mismos a qe. estaba obligado. Franco. de los Rios; cuyos réditos deben comenzar a correr desde primo. de Enero y pa. su seguridad sbre. pral. hipotecó UNA CASA TERRERA, SITUADA EN LA CALLE DE SAN SEBASTIÁN, de piedra y azotea, lindando con la de Bruno Muñoz, y Da. Juana de Silva, sobe. la qe. hay otro impuesto pr. Hilario de Lara de CIENTO VEINTE Y CINCO ps. Pto. Rico y Marzo nueve de mil ochocientos trece año C. Firmado, Franco de Acosta.'

"Este asiento fué trasladado al Registro Moderno en julio 16 de 1895, viniendo a constituir la tercera inscripción de la finca No. 1486, o sea, la casa No. 80 de la Calle de San Sebastián de San Juan.

"La primera inscripción de la finca No. 1486, verificada el 5 de noviembre de 1894, y referente a la venta de la finca a doña Elvira Capetillo, hace mención del gravamen que nos ocupa en los siguientes términos:

" 'Esta finca se halla afecta . . . a un censo de seiscientos setenta y cinco pesos a favor del Convento de Madres Monjas de esta Capital, inscrito al folio 122, número 351 del Libro quinto antiguo y reconocido también en el título que sirve para esta inscripción.'

"En las inscripciones cuarta y sexta, relativas a ventas de la finca, se reconoció la existencia del gravamen.

"En la inscripción novena aparece el Registrador cancelando, a solicitud de la dueña de la finca doña Mercedes Valldejuli, 'las hipotecas por ciento veinte y cinco pesos y seiscientos setenta y cinco pesos, constituídas para garantizar censos a favor del Arcediano Juan

Lorenzo de Matos y del Convento de las Madres Monjas Carmelitas, respectivamente . . .' por haber transcurrido más de 20 años 'desde la fecha de su inscripción.'

"Poco después, el 27 de octubre de 1934, Mercedes Valldejuli vendió la finca al demandado.

"Hasta el año 1931, inclusive, doña Mercedes Valldejuli, por mediación de sus representantes, pagó a la demandante el canon correspondiente al censo de 675 pesos. No se han satisfecho los cánones correspondientes a los años 1932 al 1938, inclusive."

Ninguna de las otras inscripciones en la cadena de títulos, que el juez inferior omitió mencionar en su exposición de hechos, tiene relación alguna con el censo o con los respectivos traspasos de la propiedad en cuestión.

■ Consideremos primeramente la contención del apelante de que la apelada no tiene capacidad legal para demandar. En apoyo de su posición, el apelante arguye (a) que no hubo suficiente demostración que la apelada sea, como se alega, la "sucesora y continuadora" del Convento de Madres Carmelitas de San Juan, a cuyo nombre el censo se constituyó originalmente, y (b) que un pleito de esta naturaleza debe ser entablado por el Obispo de Puerto Rico.

El argumento en cuanto al inciso (a) no es tanto un ataque a la capacidad de la apelada para demandar—en vista de la presentación en evidencia sin objeción de una copia certificada de los artículos de incorporación de la apelada—sino una contención de que la apelada no ha probado su caso en este pleito. No es necesario que nos detengamos a determinar si, como alega el apelante, la copia certificada de uno de los artículos de incorporación de la apelada al efecto de que ella es la "sucesora y continuadora" del Convento de Madres Carmelitas de San Juan, es inadmisible como evidencia en beneficio propio (*self-serving evidence*). Esto se hace innecesario, en vista de la deposición del Padre Aurelio Marrero al efecto de que las dos órdenes religiosas son la misma, y de que nunca ha existido orden religiosa alguna del mismo nombre en Puerto Rico. Aun cuando esta evidencia

quizá no era la mejor para establecer que la apelada era la sucesora, no era inadmisible, y en vista de que el apelante no ofreció testimonio alguno en contrario, la corte de distrito estuvo justificada al concluir que "dicha deposición es suficiente para identificar a la demandante con el Convento de Madres Monjas Carmelitas."

Como ésta no es una controversia entre la Iglesia y el Pueblo de Puerto Rico, nada tiene que ver con este caso la resolución conjunta de 16 de septiembre de 1908, Leyes de Puerto Rico, 1909, pág. 107, citada por el apelante. La contención de que solamente el Obispo de Puerto Rico podía entablar el presente pleito carece de mérito, toda vez que la apelada, desde su incorporación, goza de un *status* jurídico que claramente incluye el derecho a demandar.

Otros alegados errores señalados por el apelante son discutidos adecuadamente en la hábil opinión del juez inferior, que lee en parte como sigue:

"La propiedad del demandado, o sea la casa No. 80 de la Calle San Sebastián es la propiedad sujeta al gravamen que aparece de su inscripción tercera. Es cierto que no se presentó en evidencia la escritura en que se constituyó el gravamen. Pero esa circunstancia carece de importancia si se tiene en cuenta que la escritura se otorgó hace mucho más de un siglo, y que tanto los libros antiguos de la Anotaduría como el Registro moderno demuestran en forma oficial y auténtica que la escritura se otorgó.

"No obstante, arguye el demandado que no hay prueba de que la propiedad gravada de acuerdo con los términos de la escritura sea precisamente la casa No. 80 de la Calle San Sebastián. Creemos que la prueba es abrumadora en ese sentido. Es cierto que el asiento original en la antigua Anotaduría no menciona el número de la casa en la calle San Sebastián, y que los colindantes a que se refiere dicho asiento no aparecen como colindantes de la casa No. 80 en el moderno Registro. Extraño sería, en verdad, que los colindantes de la casa en el año 1813 continuaran siéndolo un siglo después, y sospechosa sería la prueba de la demandante si hubiese pretendido probar tal extremo. El hecho de que la casa hoy lleve el número 80, y de que en el asiento practicado en el año 1813 no se mencionara el número de la casa, igualmente carece de importancia. Lo que sí es importante, y sirve,

en ausencia de prueba en contrario, para identificar definitivamente la casa gravada en el 1813 con la que hoy lleva el número 80 de la calle San Sebastián, es el hecho de que, antes de haberse trasladado a los libros modernos el asiento hecho en el 1813, y al otorgarse la escritura que motivó la inscripción primera de la casa No. 80, los causantes del demandado reconocieran en forma clara y definitiva que esa era precisamente la propiedad sujeta al gravamen impuesto en el año 1813.

"Sostiene el demandado que no hay prueba de que los que constituyeron el gravamen en el 1813 fuesen entonces dueños de la propiedad gravada. Es cierto que la única prueba que sobre este extremo existe es el hecho de que esas personas constituyeran el gravamen. Este hecho basta para producir la presunción rebatible de que eran los dueños (véase el artículo 464 del Código de Enjuiciamiento Civil. Ed. de 1933, y en particular los apartados 8, 12, 19 y 20, en su texto original en el idioma inglés), pero además está la admisión hecha por los causantes del demandado, en documento público (la escritura que motivó la inscripción primera de la casa No. 80) en cuanto a la validez y vigencia del gravamen. Contra esa presunción y esa admisión no ha presentado el demandado prueba alguna excepto certificaciones demostrativas de que en los libros MODERNOS no aparecen como dueños de la casa No. 80 las personas que en el año 1813 impusieron el gravamen que nos ocupa. Pero los libros modernos no pretenden decirnos quiénes eran los dueños de las propiedades que en Puerto Rico existían en el año 1813, por lo que dichas certificaciones carecen de valor probatorio en este caso.

"[En] el caso de *Marrero* v. *Skerret,* 17 D.P.R. 568, citado por el demandado, en el que se juzgó insuficiente la prueba de la existencia de un censo, no es aplicable. La única prueba que allí se presentó, según dice el Tribunal Supremo, fué una opinión o conclusión del Registrador de la Propiedad al efecto de que cierta finca estaba afecta a cierto censo. No se presentó, como en este caso, una copia literal del asiento en los antiguos libros, ni de la inscripción contentiva del traslado de dicho asiento a los modernos libros. Tampoco hubo la admisión que hay en este caso, hecha por los causantes del demandado MIENTRAS FUERON DUEÑOS DE LA FINCA GRAVADA. En el caso de *Skerret, supra,* la manifestación (y no admisión) de los causantes de los demandados fué hecha después de haberse aquéllos desprendido de la propiedad que se alegaba gravada.

"Sostiene además el demandado que el asiento original en que se expone el gravamen alegado en la demanda, así como su traslado a

los libros modernos, son nulos. Se impugna el asiento por ser insuficiente de acuerdo con nuestro Código Civil. Nuestro Código Civil no regía en el año 1813. Se impugna el traslado porque no se hizo a petición de parte interesada, y porque el Registrador lo hizo errónea y negligentemente. Nada hay en la prueba que indique que el Registrador cometiese error alguno. Aparece que el traslado se hizo a solicitud del Colector General de Vacantes, Manuel Díaz Caneja. No existe prueba alguna de que éste no fuese la persona autorizada para actuar a nombre de las Madres Carmelitas. Tenemos que presumir, en ausencia de prueba en contrario, que Díaz Caneja acreditó ante el Registrador su representación (véase el apartado 15 del artículo 464 del Código de Enjuiciamiento Civil, Ed. de 1933.)''

█ Aunque la corte inferior no discutió en su opinión la contención del apelante de que la incripción original en la antigua Anotaduría era una nulidad debido a que fué hecha por la misma persona, como registrador, ante quien se otorgó el documento como notario, no se ha llamado nuestra atención a estatuto alguno que declarara nulo en 1813 una inscripción bajo tales circunstancias.

█ Otro de los errores señalados envuelve la cuestión de si, en las palabras de la corte de distrito ''fué o no válida la cancelación de . . . inscripción en los libros modernos hecha por el registrador a petición de la causante del demandado, sin la intervención de la demandante.'' Adoptamos el lenguaje del juez inferior sobre esta cuestión, que lee en parte como sigue:·

''El registrador creyó estar autorizado para cancelar a base de la sección de la Ley No. 12 de agosto 29 de 1923, que dispone que cualquier dueño de inmuebles 'sobre los cuales pesen gravámenes hipotecarios que tengan veinte (20) años de vencidos o de constituídos, si no tuvieren vencimiento' podrá obtener del registrador, transcurrido un año de la vigencia de la ley, la cancelación de la hipoteca.

''Asumió el registrador que lo que estaba cancelando era una hipoteca. Veamos si era hipoteca o censo lo que pretendió cancelar.

''Nos dice el Registrador de la Propiedad de San Juan, en certificación presentada en evidencia por el demandado, que en la Antigua Anotaduría aparecen asientos demostrativos de la existencia de un CENSO de 675 pesos a favor de las Madres Monjas, constituído so-

bre una casa situada en la Calle de la Cruz, y que estos asientos fueron CANCELADOS por haberse constituído otro CENSO sobre la casa en la Calle de San Sebastián (la propiedad del demandado), según hemos visto. Pasa el Registrador a transcribir literalmente el asiento de este último censo (véase supra). De ese asiento se ve claramente que se trata de la constitución de un censo. Hay en el asiento una sola palabra que pudiera considerarse como inconsistente con el censo y consistente con una hipoteca, y es la que ocurre en la siguiente frase: 'y para su seguridad sobre principal HIPOTECÓ una casa terrera'.

''En otras palabras, nos dice el asiento que el dueño de una casa constituyó un censo, y en garantía del capital del censo 'HIPOTECÓ' la casa. Si en vez de utilizarse la palabra 'HIPOTECÓ' se hubiese utilizado la de 'gravó', no cabría la menor duda de que el asiento se refiere a un censo y no a una hipoteca. Pero es que en el año 1813, cuando se practicó el asiento, y por muchos años antes y después, era frecuente el uso del verbo 'hipotecar' como sinónimo de 'gravar', o 'sujetar' a un censo, o 'acensuar'.

''Así, en año 1705, vemos a don Felipe V, en la pragmática del 12 de febrero, decir:

'' '. . . y que muchos acreedores censualistas, reconociendo su mayor beneficio en conservar su deudor en la cultura y administración de sus bienes que en admitir la voluntaria dimisión de las hipotecas, han minorado los réditos de los censos . . .' (Libro X, Título XV, Ley VIII de la Novísima Recopilación).

.''Y el 11 de julio de 1761, decía Don Carlos III en un decreto:

'' 'He venido en conceder a los poseedores de mayorazgos, y a los Patronos y Administradores de las casas que pertenezcan a obras pías sujetas a la Real jurisdicción, y a los tutores y curadores de menores mi Real permiso y facultad, para que puedan imponer sobre ellas censos, cuyos capitales no excedan de los necesarios para costear las obras precisas para la limpieza de Madridad, sino es que sea para redimir otros censos impuestos antes sobre dichas casas a tres por ciento, baxándolos a dos y medio o a menos, HIPOTECANDO A LA SATISFACCIÓN DE SUS RÉDITOS, y seguridad del capital que recibieren, las mismas cosas y otras fincas del mismo mayorazgo u obra pía . . .'

''(Novísima Recopilación, Libro X, Título XV, Ley XI.)

''Quince años antes de practicarse el asiento que estamos examinando decía Don Carlos IV en su real orden del 18 de diciembre de 1798:

" '. . . que los censos perpetuos o enfitéuticos, que tengan contra sí los bienes en favor de particulares, de cuerpos eclesiásticos, o de fundaciones piadosas, pasen con las mismas. fincas que les sirven de hipoteca . . .'

" (Novísima Recopilación, Libro X, Título XV Ley XX.)

"Escriche, (Diccionario Razonado de Legislación y Jurisprudencia, pág. 441), escribe:

" 'La cosa censida tiene, según unos, la calidad de HIPOTECA; pero aunque así se le suele llamar generalmente, como no se acomodan a ésta las reglas de las demás hipotecas, parece más probable la opinión de los que consideran la carga del censo como una servidumbre impuesta en la cosa'.

"Y el comentarista León Bonel y Sánchez dice del censo consignativo en el volumen 4, página 609 de sus comentarios:

" 'por el cual no se transfiere ni divide el dominio de la cosa objeto del contrato, sino que se impone o consigna sobre ella un capital, con obligación de entregar al capitalista una pensión que afecta a la finca sobre que se impuso el capital, (es por lo tanto una especie de hipoteca pensionada) . . .'

"No debe extrañarnos, por lo tanto, que el encargado de los antiguos libros en San Juan en 1813 no titubeara en titular el asiento 'Censo', ni que el Registrador de la Propiedad de San Juan en la certificación que a solicitud del demandado expidió el 5 de enero de 1940 (*Exhibit* 2 del demandado) califique de censo el derecho o gravamen que del asiento aparece, ni que en la primera inscripción de la finca del demandado, y en la escritura de venta que motivó dicha inscripción, las partes y el Registrador calificasen de censo el derecho o gravamen que nos ocupa.

"No fué hasta el 8 de enero de 1934 que se le ocurrió a alguien la posibilidad de asirse de la palabra 'hipotecó' que contiene el asiento, para sugerir que se trataba de una hipoteca, y obtener, como obtuvo al día siguiente, la cancelación *ex parte* de un derecho legítimo de la demandante para cuya cancelación no había la menor justificación ni de la faz del Registro, ni ante la realidad de los hechos.

"El Registrador carecía por completo de autoridad para cancelar la inscripción del derecho de la demandante. No se trataba, como hemos visto, de una hipoteca, sino de un censo, y ni la Ley No. 12 de 29 de agosto de 1923 ni la No. 12 de 25 de junio de 1924 autorizan la cancelación de la inscripción de un censo. *Chiqués* v. *Registrador*, 34 D.P.R. 597.

"Arguye el demandado, no con mucho tesón por cierto, que no se trata de una inscripción, sino de una MENCIÓN de censo. No es así. El asiento original es el equivalente, en el sistema antiguo, de la inscripción de nuestra Ley Hipotecaria, y su traslado a los libros modernos se hizo constar como inscripción, o sea, la inscripción tercera de la finca del demandado. . . . .

"Puesto que el Registrador canceló sin autoridad es nula la inscripción novena de la finca del demandado, en tanto en cuanto dicha inscripción pretende cancelar el censo de la demandante que aparece inscrito en la inscripción tercera. Véase el artículo 33 de la Ley Hipotecaria . . . ."

■ El apelante alega que es un tercero por el fundamento de que adquirió la propiedad aquí envuelta después de la cancelación del censo. Pero las razones que establecen la nulidad de la cancelación del censo aparecen de las propias inscripciones del registro, y como dijo el Tribunal en *Ochoa v. Hernández*, 230 U.S. 139, 164:

"Es una doctrina familiar, reconocida universalmente donde están vigentes leyes para el registro o la inscripción de escrituras de traspaso, que todo comprador adquiere su título sujeto a cualquier defecto o vicio que pueda descubrirse al hacerse referencia a su cadena de títulos según constan en los registros públicos. (Citas).

"Este principio está reconocido en los artículos 34 y 37 de la Ley Hipotecaria. Al referirse a 'causas que no resulten claramente del mismo Registro,' y a 'causas que consten expresamente en el registro,' se refieren desde luego a cuestiones de hecho y no a cuestiones de derecho. En otras palabras, si el registro anuncia cierto estado de hechos que hace que el título sea nulo, o sujeto a ser atacado en derecho, el comprador que descansa en la inscripción recibe su título sujeto a cualesquiera consecuencias que puedan surgir ante la ley de los hechos así anunciados."

Véanse 2 Morell, "Comentarios a la Legislación Hipotecaria" 617, 619, 620; *Anaud v. Martínez et al.*, 40 D.P.R. 669, 675; *Cabo Rodríguez v. Anaud*, 54 F. (2d) 585, 587; *Ayala v. Flores*, 50 D.P.R. 873, 880.

■ El apelante arguye que la alegada causa de acción en este caso ha prescrito, de conformidad con el artículo 37 de la Ley Hipotecaria, toda vez que ha transcurrido más de

un año desde la fecha de la cancelación. Dicho artículo, que provee en cuanto a acciones rescisorias y resolutorias, no tiene aplicación a este caso.

*La sentencia de la corte de distrito será confirmada.*

El Juez Asociado Sr. Todd, Jr., se inhibió.