**Fawber v. Dauphin County Tax Claim Bureau**

*Arthur K. Dils,* for plaintiffs.
*F. R. Martsolf,* for defendant tax claim bureau.
*Norman M. Yoffe,* for defendant Alan Goldstein.

DOWLING, *J.,* September 28, 1987—
*"The Power to Tax Involves
the Power to Destroy."*[1]

In a scenario one might expect to read in Pravda as an example of the "degenerate bourgeoisie" grinding down the "helpless" proletariat, we find the Fawbers stripped of their land (valued in excess of $30,000) for inadvertently paying approximately $350 in back taxes instead of some $400, the correct amount due.

The disparity here evident between justice and law is not a mere gap, but a gulf of oceanic proportions.

On July 13, 1984, Paul Fawber received notice by certified mail from the Dauphin County Tax Claim Bureau that his 1983 county, township and school taxes were delinquent. In response to this notice, Paul and his wife Mona sent two money orders to DCTCB for the payment of their delinquent 1982 and 1983 taxes. The monies were first applied to the 1982 taxes, and the remainder to the 1983 taxes.

Matters rested until approximately a year later when, on August 10, 1985, Paul received another notice from the DCTCB by certified mail, this time

---

1. Marshall, C.J., *McCulloch v. Maryland,* 4 Wheat. 316, 4 L.Ed. 579 (1819).

of the imminent sale of his and his former wife, Betty's, property,[2] a tract of land of 5¾ acres located in Grantville, Dauphin County.

Two days before, on August 8, notice of sale was posted on the property by Kenneth M. Lester and Robert S. Crawford from the DCTCB. At the same time, the officials attempted personal service on whom they believed to be Betty Fawber.[3] However, the person actually served was Mona.

On August 9, 1985, notice of sale was also advertised in the Patriot and Evening News, the Middletown Press and the Dauphin County Reporter.

DCTCB held the upset sale on September 9, 1985, when the property was sold to defendant Goldstein for $233.41. Ten days later, Paul received his last notice from the DCTCB, again by certified mail, that his land had been sold.

In January 1986, Paul and Mona filed what is styled a complaint objecting to the tax sale.[4] After a hearing the court entered an opinion and order, April 20, 1987, denying plaintiffs' exceptions. Plaintiffs subsequently motioned the court to reconsider its decision.

In the recent case of *Tracy v. County of Chester, Tax Claim Bureau*, 507 Pa. 288, 489 A.2d 1334 (1985), our Supreme Court, affirming the trial

---

2. Though divorced for many years, both Paul and Betty remain listed as record owners of the land.

3. The affidavit of service recites that Betty Fawber received service of the personal notification. However, Mona testified that it was she who had actually received service. Moreover, Betty has not been seen by either Paul or Mona since she left some seven years before.

4. The reason for the late filing appears to be that plaintiffs and defendant Goldstein were engaged in extended negotiations in an attempt to remedy the harsh consequences of the sale. In any event, defendant made no objection to going forward.

court's decision to set aside the tax claim bureau's sale of a parcel of real estate for failure to comply with the notice provisions of the real estate tax sale law,[5] stated:

"Somehow, over the years, taxing authorities have lost sight of the fact that it is a momentous event under the United States and the Pennsylvania Constitutions when a government subjects a citizen's property to forfeiture for the non-payment of taxes. We have had occasion before to note that we hold no brief with wilful, persistent and long standing tax delinquents, but at the same time, we have also observed that the "strict provisions of the Real Estate Tax Sale Law were never meant to punish taxpayers who omitted through oversight or error . . . to pay their taxes. *Ross Appeal*, 366 Pa. 100, 107, 76 A.2d 749, 753 (1950). As this court stated in *Hess v. Westerwick*, the purpose of tax sales is not to strip the taxpayer of his property but to insure the collection of taxes. 366 Pa. 90, 98, 76 A.2d 745, 748 (1950).

The collection of taxes, however, may not be implemented without due process of law that is guaranteed in the commonwealth and federal constitutions; and this due process, as we have stated here, requires at a minimum that an owner of land be actually notified by government, if reasonably possible, before his land is forfeited by the state." *Tracy*, at 1339.

We too, throughout our many years on the bench, have had occasion to address the requirements of due process in the context of these pernicious tax sales. In *Baltz v. Aronauer,* 98 Dauph. 105, 108 (1976), we wrote:

---

5. 72 P.S. §5860.101 et seq.

"It must be remembered that due process, the cornerstone of our state and federal institutions applied to property as well as to life and liberty. As said by Mr. Justice Pitney in *Ochoa v. Hernandez Y. Morales*, 230 U.S. 139, 161 (1912), 'The principle known to the common law before Magna Charta, was embodied in that charter (Coke 2 Inst. 45, 50) and has been recognized since the Revolution as among the safest foundations of our constitutions.'

"One could philosophize in this 200th year of our nation's birth on the different meanings attributed to 'due process,' depending upon whether one is speaking of the rights of persons accused of crime or dispossessed property holders. Our zeal for protecting the former is fast approaching the realm of self-destruction, while the latter seems relegated to the far periphery. In what manner and for what reasons the appellate courts have developed such an 'affectional preference' for the criminal strata of our society is beyond the scope of the present opinion and, in any event, beyond the comprehension of the writer. Whatever else may be said, it must inhibit the taking of a man's property and giving it to another without notice and an opportunity to be heard.

" 'Due process,' that magic phrase which has unlocked many a prison door, prevented numerous persons from receiving their just due and unleashed upon peaceful communities countless felons, can certainly be invoked in aid of the financially destitute to require strict compliance with statutes authorizing the government to sell private property at a fraction of its value."

Because of the harsh and unforgiving consequences which may result, it is imperative that the notice provisions of the Real Estate Tax Sale Law be strictly complied with. "The axiom that the notice provisions of the Real Estate Tax Sale Law are

strictly construed to guard against deprivation of property without due process of law is firmly entrenched." *Matter of Tax Claim Bureau Sale,* 72 Pa. Commw. 218, 455 A.2d 1294, 1296 (1983), citing *Povlow Appeal,* 48 Pa. Commw. 435, 410 A.2d 376 (1980). See also *Hess v. Westerwick,* 366 Pa. 90, 76 A.2d 745 (1950); *Ross Appeal,* 366 Pa. 100, 76 A.2d 749 (1950); *Clawson Appeal,* 39 Pa. Commw. 492, 395 A.2d 703 (1979).

In 1980, the Real Estate Tax Sale Law was amended by adding the definition of "owner-occupant" to section 5860.102. Owner-occupant is there defined as "the owner of all property which has improvements constructed thereon and for which the annual tax bill is mailed to the owner at the same address as that of the property." The practical effect of the addition is found in section 5860.601 which provides, in pertinent part: "Owner occupied property shall not be sold until at least 10 days after the owner-occupant as defined in section 102 is *personally notified* of the sale by the sheriff or his designee." (emphasis supplied). The importance of the requirement of personal notification is highlighted by the further requirement that if personal notice cannot be served within 25 days, the bureau must petition the court to seek waiver of the notice.

As was noted earlier, the assessors' affidavit of service recited that Betty Fawber had been served with personal notice of the impending sale. However, the testimony of Mona indicates that, in fact, she received the notice. While Mona is undoubtedly an occupant residing on the premises, she is not an owner-occupant as defined in section 5860.102. The record owners of the property are Paul and his former wife, Betty. We read the Real Estate Tax Sale Law as applied to the instant case to require personal notification be given to Paul, the only indi-

vidual who falls within the definition of owner-occupant. If our construction has offended think but this and all is mended that you have here a confiscation of a citizen's land sold for a mere pittance to satisfy an obligation of less than $50. Piece out our imperfections by the justice of the cause and the enormity of the injustice sought to be perpetrated.[6]

Our closing statement in *Garner v. Dauphin County Tax Claim Bureau,* 101 Dauph. 250, 253 (1979) is as pertinent now as when it was first proffered:

"In days gone by when the government exercised its rights to take a convicted murderer's life, it was said that his trial had to be free from the slightest error. So in the present day of confiscatory tax sales, it is not asking too much that the enabling statute should be followed to the letter. Let us sprinkle a little due process, not only on the heads of the sinners but on the faithful as well."

The above analysis is sufficient to void the tax bureau's sale of Mr. Fawber's property. There exist, however, other facts of record that cast the instant case into a more humane perspective and cause the light of equity to shine in plaintiffs' favor.

We first note that Paul and Mona made a substantial payment towards their delinquent 1983 taxes. This is not a case of persistent and wilful evasion of

---

6. In view of Senator Biden's now vanished presidential aspirations, we feel obligated to mention that this is a paraphrase from the closing lines of Shakespeare's A Midsummer Night's Dream:

"If we shadows have offended
Think but this and all is mended
That you have but slumbered here
While these visions did appear."

and The Life of Henry The Fifth:

"Piece out our imperfections with your thoughts."

the plaintiffs' obligation to pay their taxes. Moreover, leading up to the time of the tax sale Paul, who was a steelworker, had been in and out of work because of the devastating economic problems facing the steel industry. Although he did finally get a job as a garbage man, money was invariably short.

Because Paul can barely read or write, Mona was responsible for taking care of their bills. A little over a week after their property was posted (neither Paul nor Mona ever saw the actual posted notice), on August 16, 1985, Mona's father died and she assumed responsibility for making the funeral arrangements. In the midst of her grief she simply forgot about taking care of the delinquent tax bill.

Lastly, we mention the monstrous disparity between the value of the property, estimated at approximately $30,000, and the total upset price of $233.41 paid for the tract by defendant Goldstein. This is simply and emphatically unconscionable.

We have never condoned nor understood why such extreme measures must be employed to collect delinquent taxes. If this were a contract between private parties, it would be well within our power to simply void the agreement on grounds of unconscionability. However, in *Povlow v. Brown,* 12 Pa. Commw. 303, 315 A.2d 375 (1974), a case originally arising out of this court, the Commonwealth Court held that we lacked the power to set aside a tax sale conducted pursuant to the Real Estate Tax Law solely on the ground of the inadequacy of the sale price. It should be noted that Judge Rogers' devout hope for settlement was not consummated, and the property was retained by the tax sale purchaser. Any pre-appellate decision inclination to negotiate was obviously chilled by the Commonwealth Court's reversal of the court below.

We appreciate that taxes are the price paid for the privilege and right of being a citizen and that there must be a means for their collection when the taxpayer is delinquent. Yet, in this enlightened age such Draconian measures as are presently employed seem wholly unnecessary and in fact appear more appropriate to an authoritarian regime.

Some may say a court of law is not the forum to redress the inequities of the tax sale law. Perhaps? We might reply that the closer the law approaches justice, the more it represents true law. If the Legislature is waiting for someone to sound the trumpet, here is the clarion call. It should be remembered that the fair administration of the law is the cement that holds our society together.

Accordingly, we enter the following

## ORDER

And now, this September 28, 1987, the deed of the Dauphin County Tax Claim Bureau to Alan Goldstein is hereby cancelled.

Judge Clarence C. Morrison dissents.